1  JEFFREY N. WILLIAMS (SBN 274008)
   jwilliams@wfslaw.com
2  BRANDON R. PARRISH (*pro hac vice* to be filed)
   bparrish@wfslaw.com
3  WARGO, FRENCH & SINGER LLP
4  601 S. Figueroa St., Suite 4625
   Los Angeles, CA 90017
5  Tel: (310) 853-6300 | Fax: (310) 853-6333

6  Attorneys for Defendant/Counterclaimant Wingpow International Limited

7
8                    **UNITED STATES DISTRICT COURT**
                    **CENTRAL DISTRICT OF CALIFORNIA**

9  Line One Laboratories Inc. (USA), a          Case No. 2:22-cv-02401-FMO
10 California corporation,
                                                **ANSWER TO FIRST AMENDED**
11            Plaintiff,                         **COMPLAINT AND FIRST**
                                                **AMENDED COUNTERCLAIM**
12       v.
                                                *DEMAND FOR JURY TRIAL*
13 Wingpow International Limited, a private
   limited company organized in the United      Complaint filed: April 8, 2022
14 Kingdom; Gary Ayckbourn, an individual;      FAC filed: September 6, 2022
   Mark James Ayckbourn, an individual;
15 and DOES 1-10, inclusive,                     Hon. Fernando M. Olguin
16            Defendants.
17 ─────────────────────────────────
18 And Related Counterclaims.
19
20
21
22
23
24
25
26
27
28

1    Defendant Wingpow International Limited ("WPIL" or "Defendant") hereby
2    answers the First Amended Complaint ("FAC") of Plaintiff Line One Laboratories Inc.
3    ("LOL") as follows:

4    **THE PARTIES**

5    1.    Defendant is without knowledge or information sufficient to form a belief
6    as to the truth of the allegations contained in Paragraph 1 of the First Amended
7    Complaint and therefore denies those allegations.

8    2.    In response to Paragraph 2 of the First Amended Complaint, Defendant
9    states that WPIL is a private limited company organized under the laws of the United
10   Kingdom with a registered office address in Witney, Oxfordshire, England.  Defendant
11   denies the remaining allegations in Paragraph 2 of the First Amended Complaint.

12   3.    In response to Paragraph 3 of the First Amended Complaint, Defendant
13   states that Gary Ayckbourn is a director and Secretary of WPIL domiciled in the United
14   Kingdom.  Defendant denies the remaining allegations in Paragraph 3 of the First
15   Amended Complaint.

16   4.    In response to Paragraph 4 of the First Amended Complaint, Defendant
17   states that Mark James Ayckbourn is a director of WPIL domiciled in the United
18   Kingdom.  Defendant denies the remaining allegations in Paragraph 4 of the First
19   Amended Complaint.

20   5.    Defendant is without knowledge or information sufficient to form a belief
21   as to the truth of the allegations contained in Paragraph 5 of the First Amended
22   Complaint and therefore denies those allegations.

23   6.    In response to Paragraph 6 of the First Amended Complaint, Defendant
24   states that Gary Ayckbourn is a director and Secretary of WPIL.  Defendant denies the
25   remaining allegations in Paragraph 6 of the First Amended Complaint.

26   7.    In response to Paragraph 7 of the First Amended Complaint, Defendant
27   states that Mark James Ayckbourn is a director of WPIL.  Defendant denies the
28   remaining allegations in Paragraph 7 of the First Amended Complaint.

8.      In response to Paragraph 8 of the First Amended Complaint, Defendant admits that Gary Ayckbourn and Mark James Ayckbourn, among others, are principals of WPIL and contribute to business decisions made on WPIL's behalf.  Defendant also admits and states that WPIL and LOL maintained a years-long business relationship until that relationship was unilaterally and wrongfully breached by LOL.  Defendant denies the remaining allegations in Paragraph 8 of the First Amended Complaint.

9.      Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9 of the First Amended Complaint and therefore denies those allegations.

10.     Defendant states that the allegations in Paragraph 10 of the First Amended Complaint are merely legal conclusions that do not necessitate a response.  To the extent any response is necessary, Defendant denies the allegations in Paragraph 10 of the First Amended Complaint.

11.     Defendant states that the allegations in Paragraph 11 of the First Amended Complaint are merely legal conclusions that do not necessitate a response.  To the extent any response is necessary, Defendant denies the allegations in Paragraph 11 of the First Amended Complaint.

12.     Defendant states that the allegations in Paragraph 12 of the First Amended Complaint are merely legal conclusions that do not necessitate a response.  To the extent any response is necessary, Defendant denies the allegations in Paragraph 12 of the First Amended Complaint.

13.     Defendant states that the allegations in Paragraph 13 of the First Amended Complaint are merely legal conclusions that do not necessitate a response.  To the extent any response is necessary, Defendant denies the allegations in Paragraph 13 of the First Amended Complaint.

## JURISDICTION AND VENUE

14.     Defendant admits the allegations in Paragraph 14 of the First Amended Complaint.

15.     Defendant denies the allegations in Paragraph 15 of the First Amended Complaint.

16.     Defendant denies the allegations in Paragraph 16 of the First Amended Complaint.

17.     Defendant denies the allegations in Paragraph 17 of the First Amended Complaint

## **BACKGROUND FACTS**

18.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the First Amended Complaint and therefore denies those allegations.

19.     In response to the allegations in Paragraph 19 of the First Amended Complaint, Defendant states as follows: Since 2006, WPIL, in conjunction with LOL, has been an international seller of sexual health products.  WPIL is responsible for all administrative, design, marketing, and customer-facing aspects of the business, while LOL is responsible for the manufacturing aspects of the business.  The parties' generally-established course of dealings is as follows: Upon receipt of a purchase order from a customer, WPIL sends the purchase order to LOL via its wholly-owned factory in China, which promptly confirms receipt, orders the component parts, and prepares a manufacturing schedule.  After WPIL confirms the manufacturing schedule with the customer, the factory begins the manufacturing process.  Once production is complete, the factory prepares an invoice for the cost of manufacturing the goods including parts; labor; and overhead, and arranges shipment to the customer, usually at the customer's expense.  Upon shipment, the factory provides WPIL with a packing list and proof of delivery, LOL with the invoice for costs, and WPIL with a similar invoice for informational purposes.  Around the same time, WPIL prepares an invoice to the customer for the amount of the factory's invoice plus an additional markup for overhead and profit in accordance with its contract with the customer (sometimes 30%, though sometimes a different amount).  LOL then prepares an invoice to WPIL for the amount

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

of the factory's invoice plus 60% of the markup to the customer. LOL's invoice contains payment terms generally requiring payment within 60-to-90 days (though LOL accepts payment thereafter in instances when WPIL has not received timely payment from the customer). This course of dealing between the parties had been in place for over *fifteen years* as a mechanism for WPIL and LOL to split the earnings from the manufacture and sale of goods of the enterprise until LOL and its principal and related entities breached that course of dealings in a variety of ways, including by instructing the factory to refuse to fulfill purchase orders from WPIL and to deal directly with WPIL's customers, cutting WPIL out of the business altogether. Defendant denies all allegations in Paragraph 19 of the First Amended Complaint that are inconsistent with the foregoing.

20.    In response to Paragraph 20 of the First Amended Complaint, Defendant incorporates by reference its response to Paragraph 19 of the First Amended Complaint and denies all allegations inconsistent therewith.

21.    In response to Paragraph 21 of the First Amended Complaint, Defendant incorporates by reference its response to Paragraph 19 of the First Amended Complaint and denies all allegations inconsistent therewith.

22.    In response to Paragraph 22 of the First Amended Complaint, Defendant incorporates by reference its response to Paragraph 19 of the First Amended Complaint and denies all allegations inconsistent therewith.

23.    In response to Paragraph 23 of the First Amended Complaint, Defendant incorporates by reference its response to Paragraph 19 of the First Amended Complaint and adds that the parties agreed certain customers would pay LOL directly, and LOL would be required to pay WPIL 40% of the agreed-upon markup. WPIL is without sufficient knowledge and information to form a belief as to any payments between LOL and the factory and denies any remaining allegations in Paragraph 23 of the First Amended Complaint.

24.      In response to Paragraph 24 of the First Amended Complaint, Defendant states that in or around May 2021, LOL's principal Calvin Spencer Lee a/k/a Budiman Lee ("Lee") advised WPIL that he planned to close the factory.  The Ayckbourns did not visit Los Angeles in June or July 2021.  WPIL did, however, ask that LOL keep the factory running and—without any choice in the matter given that Lee otherwise would have shuttered the factory and destroyed WPIL's business—agreed to Lee's demand that it pay forty percent (40%) of "labour losses," as that term was used between the parties, in order to keep the factory operational.  However, the factory did not return to pre-pandemic production levels.  Lee intermittently halted production during this timeframe and ultimately ended his relationship with WPIL.  Thus, LOL failed to uphold its end of the bargain.  WPIL denies any allegations that are inconsistent with the foregoing.

## **FIRST CAUSE OF ACTION**

### **(Against All Defendants for Breach of Contract)**

25.      Defendant repeats its statements, admissions and denials for the allegations contained in Paragraphs 1 through 25 of the First Amended Complaint, inclusive, and incorporates the same herein.

26.      In response to Paragraph 24 of the First Amended Complaint, Defendant incorporates by reference its response to Paragraph 19 of the First Amended Complaint and denies all allegations inconsistent therewith.

27.      Defendant denies the allegations in Paragraph 27 of the First Amended Complaint.

28.      Defendant denies the allegations in Paragraph 28 of the First Amended Complaint.

29.      Defendant denies the allegations in Paragraph 29 of the First Amended Complaint.

30.      In response to the allegations in Paragraph 30 of the First Amended Complaint, Defendant states that well prior to April 5, 2022, LOL had repeatedly directed the factory to hold and to not fulfill purchase orders provided by WPIL's

ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM

customers, while simultaneously threatening to shut the factory down in its entirety. In light of the foregoing, WPIL reasonably requested that LOL provide assurances that it intended to cure its prior breaches by directing the factory to fulfill purchase orders dating back to the fall of 2021—which LOL refused. Defendant denies all allegations in Paragraph 30 of the First Amended Complaint that are inconsistent with the foregoing.

31.    Defendant denies the allegations in Paragraph 31 of the First Amended Complaint.

## SECOND CAUSE OF ACTION

### (Against All Defendants for Goods Sold and Delivered)

32.    Defendant repeats its statements, admissions and denials for the allegations contained in Paragraphs 1 through 31 of the First Amended Complaint, inclusive, and incorporates the same herein.

33.    Defendant denies the allegations in Paragraph 33 of the First Amended Complaint.

34.    Defendant denies the allegations in Paragraph 34 of the First Amended Complaint.

## THIRD CAUSE OF ACTION

### (Against WPIL, Gary Ayckbourn, and Mark Ayckbourn for Fraud)

35.    Defendant repeats its statements, admissions and denials for the allegations contained in Paragraphs 1 through 34 of the Complaint, inclusive, and incorporates the same herein.

36.    Defendant denies the allegations in Paragraph 36 of the First Amended Complaint.

37.    In response to Paragraph 37 of the First Amended Complaint, Defendant incorporates by reference its response to Paragraph 24 of the First Amended Complaint and denies all allegations inconsistent therewith.

38.    In response to Paragraph 38 of the First Amended Complaint, Defendant admits that Gary and Mark Ayckbourn, in their capacity as principals of WPIL, engaged

in certain e-mail conversations with Lee regarding "labour losses" at LOL's factory and that those e-mail conversations speak for themselves. Defendant denies the remaining allegations in Paragraph 38.

39.     Defendant denies the allegations in Paragraph 39 of the First Amended Complaint.

40.     In response to Paragraph 40 of the First Amended Complaint, Defendant incorporates by reference its response to Paragraph 38 of the First Amended Complaint and denies all allegations inconsistent therewith.

41.     Defendant denies the allegations in Paragraph 41 of the First Amended Complaint.

42.     Defendant denies the allegations in Paragraph 42 of the First Amended Complaint.

43.     Defendant denies the allegations in Paragraph 43 of the First Amended Complaint.

44.     Defendant denies the allegations in Paragraph 44 of the First Amended Complaint.

## FOURTH CAUSE OF ACTION

### (Against WPIL, Gary Ayckbourn, and Mark Ayckbourn for
### Negligent Misrepresentation)

45.     Defendant repeats its statements, admissions and denials for the allegations contained in Paragraphs 1 through 44 of the First Amended Complaint, inclusive, and incorporates the same herein.

46.     Defendant denies the allegations in Paragraph 46 of the First Amended Complaint.

## **FIFTH CAUSE OF ACTION**

### **(Against All Defendants for Conversion)**

47. Defendant repeats its statements, admissions and denials for the allegations contained in Paragraphs 1 through 46 of the Complaint, inclusive, and incorporates the same herein.

48. Defendant incorporates by reference its response to Paragraph 19 of the First Amended Complaint and denies all allegations inconsistent therewith.

49. Defendant denies the allegations of Paragraph 49 of the First Amended Complaint.

50. Defendant denies the allegations of Paragraph 50 of the First Amended Complaint.

51. Defendant denies the allegations of Paragraph 51 of the First Amended Complaint.

52. Defendant denies the allegations of Paragraph 52 of the First Amended Complaint.

## **SIXTH CAUSE OF ACTION**

### **(Against All Defendants for Breach of Fiduciary Duty)**

53. Defendant repeats its statements, admissions and denials for the allegations contained in Paragraphs 1 through 23 of the First Amended Complaint, inclusive, and incorporates the same herein.

54. Defendant denies the allegations of Paragraph 54.

55. Defendant denies the allegations of Paragraph 55.

56. Defendant denies the allegations of Paragraph 56 and responds to the allegations in its subparts as follows:

(i) Denied;

(ii) Denied;

(iii) Denied;

(iv) Denied;

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

1      (v)    Denied;

2      (vi)   Denied;

3      (vii)  Defendant admits that WPIL mistakenly and innocently represented

4             to Lee in March 2022 that approximately $68,000 of invoices had

5             been paid, but subsequently learned that the payment had not gone

6             through, and denies any remaining allegations.

7      57.    Defendant denies the allegations in Paragraph 57 of the First Amended

8  Complaint.

9      58.    Defendant denies the allegations in Paragraph 58 of the First Amended

10 Complaint.

11                          **SEVENTH CAUSE OF ACTION**

12      **(Against All Defendants Violations of California Penal Code Section 496)**

13     59.    Defendant repeats its statements, admissions and denials for the allegations

14 contained in Paragraphs 1 through 58 of the First Amended Complaint, inclusive, and

15 incorporates the same herein.

16     60.    Defendant denies the allegations of Paragraph 60 of the First Amended

17 Complaint.

18     61.    Defendant denies the allegations of Paragraph 61 of the First Amended

19 Complaint.

20                          **EIGHTH CAUSE OF ACTION**

21      **(Against All Defendants for Imposition of a Constructive Trust)**

22     62.    Defendant repeats its statements, admissions and denials for the allegations

23 contained in Paragraphs 1 through 61 of the First Amended Complaint, inclusive, and

24 incorporates the same herein.

25     63.    Defendant denies the allegations of Paragraph 63 of the First Amended

26 Complaint.

27     64.    Defendant denies the allegations of Paragraph 64 of the First Amended

28 Complaint.

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

1    Defendant denies any and all allegations not specifically addressed herein and
2  denies LOL is entitled to any relief in this matter, including the relief sought in the First
3  Amended Complaint.

4                                    **AFFIRMATIVE DEFENSES**

5    Without assuming the burden of proof where it otherwise rests with LOL,
6  Defendant alleges the following affirmative and other defenses:

7                                    First Affirmative Defense

8    LOL's First Amended Complaint, and each and every cause of action alleged
9  therein, fails to state facts sufficient to constitute a claim for relief.

10                                   Second Affirmative Defense

11    LOL's claims are barred, in whole or in part, because Defendant has acted in
12  good faith at all times.

13                                   Third Affirmative Defense

14    LOL has failed to take reasonable steps to reduce or minimize the damages
15  sought to be recovered in this case.

16                                   Fourth Affirmative Defense

17    LOL owes money to Defendant and/or has been paid its alleged debts directly by
18  WPIL's customers and, and as a result, any debts allegedly owed by Defendant to LOL
19  are offset by such sums.

20                                   Fifth Affirmative Defense

21    LOL's claims are barred, in whole or in part, because LOL failed to comply with
22  the terms of the parties' contract(s), implied contract(s), and/or established course of
23  dealing.

24                                   Sixth Affirmative Defense

25    LOL's claims are barred, in whole or in part, because Defendant substantially
26  complied with all material requirements of the valid, enforceable contract(s) at issue.

27

28

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

Seventh Affirmative Defense

Defendant alleges that LOL has suffered no losses or damages as a result of Defendant's alleged conduct, or any such losses or damages were *de minimis*.

Eighth Affirmative Defense

LOL's claims are barred, in whole or in part, under the equitable doctrines of waiver, estoppel, laches, or unclean hands.

Ninth Affirmative Defense

LOL's claims are barred, in whole or in part, because LOL itself breached the parties' contract(s) or committed anticipatory breach, or because LOL itself breached its fiduciary duty to Defendant, or because LOL failed to bring about a condition precedent to Defendant's performance, or because Defendant's performance was excused, frustrated or prevented by LOL's conduct.

Tenth Affirmative Defense

To the extent Defendant was negligent, which Defendant expressly denies, LOL's claims are barred in whole or in part, or LOL's recovery should be limited, under the doctrines of contributory and/or comparative negligence.

Eleventh Affirmative Defense

Defendant's alleged misrepresentations were not factual in nature and are therefore inactionable, or any alleged oral misrepresentations are contrary to the express terms of the parties' contract(s) and/or established course of dealing.

Twelfth Affirmative Defense

LOL's claims are barred by the applicable statute of limitations.

Thirteenth Affirmative Defense

Defendant's alleged agreements were procured by coercion, duress, and/or breach of fiduciary duty in that LOL knew that Defendant's business was dependent on its manufacturing relationship with LOL, and thus wrongfully threatened to close the factory if Defendant did not agree.

1    Fourteenth Affirmative Defense

2    Defendant's alleged agreements were procured by fraud in that LOL promised to

3    maintain the operation of the factory in exchange for Defendant's alleged agreements,

4    but upon information and belief, had no intent to keep that promise.  Alternately, LOL

5    should be barred from enforcing the alleged agreements under the doctrine of

6    promissory estoppel.

7    Fifteenth Affirmative Defense

8    LOL's conversion claim fails because the alleged property (money) lacks a

9    definite identity; rather, the claim is simply that Defendant failed to pay a contractual

10   sum in the form of an invoice or invoices.

11   Sixteenth Affirmative Defense

12   LOL's breach of fiduciary duty claim fails as a result of LOL's consent to and/or

13   ratification of Defendant's alleged acts.

14   Seventeenth Affirmative Defense

15   LOL's Penal Code section 496 claim fails because LOL has not alleged the

16   existence of a partnership sufficient to invoke the holding of *Siry Inv., L.P. v.*

17   *Farkhondehpour*, 13 Cal. 5th 333, 513 P.3d 166 (2022), nor can LOL prove the

18   commission of a theft, including the requisite intent.  Rather, the alleged "stolen

19   property" consists merely of alleged unpaid debts as to which LOL committed a prior

20   breach of contract or breach of fiduciary duty.

21   Eighteenth Affirmative Defense

22   In the unlikely event that WPIL's counterclaims are dismissed for failure to join

23   an indispensable party (though WPIL disputes the same), LOL's claims should

24   likewise be dismissed for failure to join an indispensable party.

25   Nineteenth Affirmative Defense

26   LOL's claims are barred because it has been unjustly enriched at WPIL's

27   expense by repudiating its business relationship with WPIL, representing to WPIL's

28

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

customers that it was no longer affiliated with WPIL, and redirecting WPIL's prior
contracts with customers and future business to LOL.

Twentieth Affirmative Defense

LOL's contract claims are barred because they are substantively and
procedurally unconscionable, as LOL has used its unilateral control over the factory to
obtain inequitable bargaining power over WPIL, extract additional monetary
contributions, and force WPIL to consent oppressive business terms.

Twenty-First Affirmative Defense

LOL's contract claims fail for lack of consideration to the extent that LOL claims
it is entitled to additional compensation for expenses outside the parties' established
course of dealing, such as labor costs.

Twenty-Second Affirmative Defense

Defendant reserves the right to rely upon other such affirmative defenses as may
be supported by the facts, to be determined by full and complete discovery, and to
voluntarily withdraw any affirmative defenses.

Dated:  September 14, 2022          WARGO & FRENCH LLP

                                    By:  _s/ Jeff Williams_
                                         JEFFREY N. WILLIAMS
                                         BRANDON R. PARRISH

                                    Attorneys for Defendant/Counterclaimant
                                    Wingpow International Limited

## **COUNTERCLAIM**

Counterclaimant Wingpow International Limited ("WPIL") hereby asserts the following Counterclaim against Counterdefendants Line One Laboratories ("LOL"); American Latex Corporation ("ALC"); and Calvin Spencer Lee a/k/a Budiman Lee ("Lee") (collectively, "Counterdefendants"),[1] stating as follows:

## **NATURE OF SUIT**

1.     According to the old proverb, "a thief believes everybody steals."  In April 2022, LOL initiated this action against WPIL and its principals, characterizing the action as nothing more than a simple dispute over WPIL's alleged non-payment of three invoices and certain ancillary costs.  In truth, LOL's filing was the culmination of a protracted scheme by its principal, Lee, to take advantage of WPIL: his partner of 16 years in an international sales and manufacturing enterprise that the parties collectively referred to and held out to the public simply as "Wingpow."  LOL did not even attempt to serve WPIL with summons in this action.  It did not need to.  Rather, in naked retribution for WPIL's refusal to capitulate to Lee's extortionate business tactics and repeated breaches of fiduciary duty, Lee used the filing of this lawsuit as cover to terminate his relationship with WPIL, falsely accuse it of not paying its bills (despite Lee having been the one to breach the parties' course of dealings well before any of the conduct identified in LOL's pleadings), and steal WPIL's customers.  Lee's actions effectively destroyed a business that had produced $12 million in revenue in 2021 and had a projected valuation of as high as $25 million by the end of 2022.

2.     WPIL was the customer-facing portion of Wingpow, a sexual health business that marketed products to large retailers in Europe and other global markets. LOL provided Wingpow's exclusive manufacturing function through its control of a factory in China.  For more than fifteen years, the parties operated under a consistent

---

[1] As used herein, the term "Counterdefendants" includes Lee in his capacity as the alter ego of any or all of the remaining Counterdefendants.  Outside the alter ego context, liability is not currently pursued against Lee in his personal capacity, aside from the Seventh Cause of Action herein.

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

course of dealings under which WPIL received 40% of net revenue from sales of the enterprise, while LOL received 60% (though Lee frequently diverted funds due LOL to his personal accounts and other businesses for a variety of reasons, including, upon information and belief, tax evasion).  Over the course of this partnership, WPIL built a robust reputation and significant goodwill amongst customers in the sexual health industry, from which Lee benefitted.  However, throughout 2021 and into 2022, Lee used his unilateral control over the enterprise's factory to wrongfully threaten and extort WPIL into paying an increasing portion of his business expenses, and later to attempt to coerce WPIL into buying him out at unreasonable and oft-changing terms.  He ultimately instructed the factory to stop fulfilling purchase orders from WPIL's customers in November 2021.  This was a clear breach of the parties' longstanding relationship.

3.      WPIL sought for months to convince Lee to re-establish the relationship. Not only did Lee refuse to do so, he used his control over the factory to force WPIL's customers to terminate their contracts with WPIL and do business directly with Lee.  He even offered them a discount, funded with the additional gains from pushing WPIL out of the business and avoiding his revenue-sharing obligations with WPIL.  Because of Lee's malfeasance, WPIL has been wrongfully stripped of the customer relationships it built over the course of nearly two decades, and now is virtually worthless.

4.      For the reasons that follow, WPIL is entitled to (1) an award of damages sufficient to compensate WPIL for Counterdefendants' contractual breaches, breaches of fiduciary duty, tortious conduct and the overall destruction of WPIL's business; (2) an equitable accounting to WPIL for all net revenues due WPIL under the parties' agreement (including prior revenues illicitly "earned" by Counterdefendants under the guise of inflated costs); and (3) punitive damages against Counterdefendants for their intentional and malicious conduct.

1

**THE PARTIES**

2    5.    WPIL is a private limited company organized under the laws of the United

3    Kingdom with a registered office address in Witney, Oxfordshire, England.

4    6.    Upon information and belief, LOL is a California corporation having its

5    principal place of business in Chatsworth, in the County of Los Angeles, California, in

6    the United States.

7    7.    Upon information and belief, ALC is a California corporation having its

8    principal place of business in Chatsworth, in the County of Los Angeles, California, in

9    the United States.

10    8.    Upon information and belief, Lee is the principal and sole shareholder of

11    LOL and ALC and is domiciled in the County of Los Angeles, California, in the United

12    States.  Upon information and belief, Lee has conducted his business dealings

13    interchangeably in the name of LOL, ALC and other entities (including Top Cat Toys)

14    over the past two decades.  As set forth in more detail below, all of the

15    Counterdefendants are alter egos of one another and thus are each jointly and severally

16    liable for the debts of the other Counterdefendants.

17    **JURISDICTION AND VENUE**

18    9.    The Court has supplemental jurisdiction over this Counterclaim pursuant to

19    28 U.S.C. § 1367(a).  Alternatively, upon information and belief, this Court has

20    jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332(a)(2).

21    10.    LOL has submitted to the personal jurisdiction of this Court.

22    11.    ALC, as a California corporation, is subject to the personal jurisdiction of

23    this Court.  Additionally, because ALC is the alter ego of LOL, ALC has submitted to

24    the personal jurisdiction of this Court via LOL.

25    12.    Lee, as an individual domiciled in California, is subject to the personal

26    jurisdiction of this Court.  Additionally, because Lee is the alter ego of LOL, Lee has

27    submitted to the personal jurisdiction of this Court via LOL.

28

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

13.     LOL has waived any objection to venue in this Court.  Additionally, because ALC and Lee are alter egos of LOL as set forth above, they have likewise waived any objection to venue in this Court.  Alternatively, venue is proper in this district under 28 U.S.C. § 1391(b)(1) because all Counterdefendants are residents of this state and judicial district, and under 28 U.S.C. § 1391(b)(2) because Counterdefendants' contractual breaches and other wrongful conduct occurred in this judicial district.

14.     Notwithstanding any of the foregoing, WPIL preserves any and all objections to jurisdiction and venue raised in its Answer.  *Hillis v. Heineman*, 626 F.3d 1014, 1018 (9th Cir. 2010).

## FACTUAL BACKGROUND

### A.     *Wingpow's Formation and History from 2004 to 2016*

15.     In or around 2001, Gary Ayckbourn met Lee at an adult industry trade show in Las Vegas, Nevada.  Lee attended the trade show as the owner of Top Cat Toys and ALC, companies that manufactured and sold adult products and condoms.

16.     Gary Ayckbourn later traveled from the United Kingdom to Los Angeles, California, to meet again with Lee and discuss potential business opportunities.  In 2001, Gary and Mark Ayckbourn's company, RW Distribution Ltd., became a distributor for Top Cat Toys, servicing customers based in international locations such as the United Kingdom, continental Europe, and Australia.

17.     In or around 2004, after having worked with the Ayckbourns in this capacity for several years, Lee approached them with a proposal for a new venture in sexual health products.  At the time, Lee was preparing to open a new factory in the Guangdong Province of the People's Republic of China, but he lacked access to international markets, particularly in the United Kingdom and European Union.  Lee proposed that they create an enterprise called "Wingpow," with Lee owning the factory and providing the original financing for the manufacture of products, and the Ayckbourns handling all customer-facing aspects of the enterprise—including product design, marketing, and building customer relationships and the overall goodwill of the

-17-

business.  Based on this arrangement, Lee proposed that his part of the enterprise receive 60% of net revenue from sales (i.e., revenues generated above and beyond manufacturing, labor, and other costs of production), with the Ayckbourns' part of the enterprise retaining 40% of net revenue from sales.

18.   Thus, in January 2006, the Ayckbourns formed WPIL to market and distribute the enterprise's products to customers based around the world, in partnership with LOL, which would provide the manufacturing function.  Upon information and belief, Lee and LOL own 100% of a Chinese factory operating as Zhuhai Wingpow Erotic & Novelty Manufacturing ("Zhuhai").  During the course of WPIL and LOL's business relationship, they often referred to LOL/Zhuhai as "Wingpow China" and WPIL as "Wingpow UK."

19.   However, despite the fact that Lee wished to split the operations, costs, and profits of the enterprise, Lee insisted that the parties do business without a written agreement because he only wished to work "based on trust."  He also did not contribute to WPIL's operating costs in the United Kingdom.

20.   Pursuant to their oral agreements, WPIL agreed to take 40% of net revenues of the enterprise based on its customer-facing duties and obligations, and LOL agreed to take 60% of net revenues for investment in and ownership of the factory.

21.   From 2006 through 2021—that is, at all times until Lee unilaterally breached the terms that had governed the parties' contractual dealings for decades, as described in more detail below—the basic business model and course of dealings for the enterprise was as follows:

    a. WPIL, which managed all marketing, sales, design, customer relationships and customer contracts, solicited and received purchase orders from customers and sent those purchase orders to the factory.

    b. Upon receipt of the purchase orders, the factory promptly ordered the component parts and materials for the products and issued WPIL a manufacturing schedule.

c. Upon shipment, the factory provides WPIL with a packing list and proof of delivery, LOL with the invoice for costs, and WPIL with a similar invoice for informational purposes.  Around the same time, WPIL prepares an invoice to the customer for the amount of the factory's invoice plus an additional markup for overhead and profit in accordance with its contract with the customer (sometimes 30%, though sometimes a different amount).  LOL then prepares an invoice to WPIL for the amount of the factory's invoice plus 60% of the markup to the customer.  LOL's invoice contains payment terms generally requiring payment within 60-to-90 days (though LOL accepts payment thereafter in instances when WPIL has not received timely payment from the customer).

d.

e. WPIL relayed the manufacturing schedule to the customer and, if the schedule and pricing were agreeable, accepted the purchase order.

f. Once manufacturing was complete and approximately seven to ten days before shipment was ready, the factory informed WPIL that the products were ready, and WPIL relayed that information to the customer.  The factory and the customer then arranged for direct shipment, usually at the customer's expense.

g. Upon shipment, the factory provided WPIL with a packing list and proof of delivery, LOL with the invoice for an invoice for the costs of labor, parts, and manufacturing related to the goods in question, and WPIL with a similar invoice for informational purposes.

h. WPIL then prepared a separate invoice to the customer for the full amount of the factory's invoice, plus a markup for overhead and profit based on its contract with the customer.

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

1          i.  LOL in turn prepared an invoice to WPIL for the full amount of the
2              factory's invoice plus 60% of WPIL's markup. LOL's invoice generally
3              contained 60-to-90 day payment terms, though LOL accepted payment
4              beyond those terms in certain instances when WPIL had not yet received
5              payment on its customer's invoice.

6      22.    Notwithstanding the above, in certain instances and for certain customers,
7  the parties agreed the customer would pay LOL directly, and LOL would be required to
8  pay WPIL 40% of the agreed-upon markup. (As detailed later, LOL frequently failed to
9  do so and, when it did, delayed payment by months at a time).

10     23.    To carry out the marketing function of the enterprise, the Ayckbourns
11 continued to attend trade shows, but instead of representing themselves as WPIL, they
12 simply represented themselves as "Wingpow." On many occasions, Lee joined the
13 Ayckbourns, and all three represented themselves as "Wingpow." All parties consented
14 that the business would and could be held out to the public as one unified enterprise.

15     24.    A key part of WPIL's sales pitch to customers was that, unlike other sellers
16 and distributors, it was a full-service producer. WPIL was able to represent to customers
17 and potential customers that it had a direct, exclusive relationship with a single
18 manufacturer, with whom it worked on a daily basis. That relationship permitted
19 customers to arrange directly with WPIL for (1) the design of premium sexual health
20 products made specifically for each customer, (2) manufacturing of these products, (3)
21 shipment, and (4) payment. WPIL's ability to market "Wingpow" as a full-service
22 operation gave it a sizeable competitive advantage in the industry—as the parties had in
23 fact intended—and after approximately three years, WPIL had developed a full book of
24 business with many regular customers. Lee and his related entities had virtually no
25 involvement in this customer development process.

26     25.    Another advantage that WPIL had in the marketplace was in the design of
27 products for each customer. The vast majority of the enterprise's products (over 90%)
28 were designed specifically for each individual customer. As part of its customer-facing

1  responsibilities, WPIL was integral to its customers' product design process.  WPIL also

2  contracted directly with a European design agency to create the exterior dress and

3  labeling for each product and bore the costs associated with the same.  Lee and his

4  related entities had minimal involvement in these design aspects of the enterprise.

5         26.    Some of the enterprise's products were novel enough for WPIL to obtain

6  U.S. patents on them (among others, US 10,940,078; US 10,195,107; US 9,526,670; and

7  US 9,844,486).  Mark Ayckbourn created the initial concept for each product and

8  worked with factory engineers to make the specifications and parts work.  Lee filed

9  these patents on behalf of the enterprise, but for each, incorrectly listed himself as the

10 inventor.  In fact, Lee had no role in the conception of these products.  Moreover, Lee

11 listed either ALC or another company he owned as Applicant and/or Assignee, even

12 though neither Mark Ayckbourn nor WPIL had assigned the rights to the patent pursuant

13 to any oral or written agreement.  However, because the intent was that all of these

14 patents would be used and monetized for the good of the whole enterprise—not just for

15 Lee and his related entities—WPIL did not object at the time.

16        27.    Once the product was designed to the customer's specifications, WPIL

17 provided the specifications to the factory's engineers for conversion into a mechanical

18 blueprint used to create a "tooling mould."  The factory then generated an invoice to

19 WPIL for production of the mould, which became the physical template for the

20 customer's products.  Depending on the customer, WPIL either charged for the full cost

21 of the tooling moulds, split the cost with the customer, or paid it in full with the

22 customer's involvement.  Thus, upon payment, the mould(s) belonged to the customer,

23 and as long as the customer continued to place orders with WPIL, the factory retained

24 possession of the mould(s) at the factory.  If a customer wished to stop using WPIL as

25 its product supplier, the mould(s) unique to that customer would be delivered to WPIL to

26 return to the customer.

27        28.    As time went on, WPIL took on an increasingly significant role in

28 designing customer products, working with staff in the United States and China to

supply materials and manufacture products, and arranging for delivery to WPIL's
customers overseas.  From product inception, WPIL coordinated the development of
new (and sometimes patented) technology between customer, design agency, and/or
engineers.  The Ayckbourns, on behalf of WPIL, visited the Wingpow factory multiple
times each year as a matter of course, often with existing or potential customers.  The
Ayckbourns also, on behalf of WPIL, routinely visited the factory to assist in working
out any last-minute design or manufacturing issues.  Conversely, Lee operated as the
front-end financier, leaving operations and logistics largely to WPIL.

**B.    *Lee's Attempts to Extort Additional Concessions from WPIL and
Unlawful Ultimatums to Close the Factory.***

29.    Over time, Lee became increasingly difficult as a business partner, despite
the fact that the enterprise was experiencing growth in sales, revenues, and goodwill in
the industry year-over-year.

30.    Upon information and belief, Lee believed that he was not receiving enough
compensation for his investment, despite the fact that (1) according to Lee, all
production and overhead costs were passed on to the customer; (2) Lee had a shrinking
share of responsibility to manage the operations and logistics of the enterprise; and (3)
Lee received a majority of the net revenue of the enterprise.  Lee also experienced
changes in his personal and family life that left him unenthusiastic about continuing the
business in the same manner as the parties had done for many years.  Lee therefore
repeatedly threatened to shut down the factory as a means of gaining leverage over
WPIL, which was entirely captive to Lee's whims.  Indeed, WPIL fully depended on the
factory to manufacture the goods of the enterprise and Lee knew it.

31.    One manner in which Lee manifested this leverage and control related to
his increasingly-blatant attempts to coerce WPIL into paying extraneous costs and
expenses of the enterprise for which they had never been responsible.  Among other
items, Lee demanded that WPIL fund the following categories of expenses: (1) courier
charges, (2) shipping costs, (3) currency depreciation in the value of the Chinese Yuan,

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

compared to the U.S. Dollar and British Pound Sterling, (4) unsubstantiated asset
depreciation relating to the factory, (5) local Chinese business taxes assessed to the
factory, and (6) certification fees from the International Organization for
Standardization.  Traditionally, some of these costs had been divided between the parties
according to the same 60/40 formula the parties had used to split profits, with WPIL
bearing 40% of the costs.  Other items, such as local Chinese taxes and additional labor,
had been borne entirely by Lee (while WPIL bore its own taxes and staffing expenses).
But Lee now demanded that WPIL split the costs for items that had been previously
borne by Lee and that WPIL entirely cover costs for items that had previously been split
between the parties.

32.    During this period, WPIL repeatedly assured Lee that it would honor all
financial obligations in accordance with the parties' terms and past practice, while at the
same time, WPIL reasonably sought assurances that Lee would maintain production and
would not shutter the factory.  Lee's behavior remained erratic, as he sometimes
committed to fulfilling orders, only to backtrack and demand additional payment.

33.    For example, in January 2016, Lee accused the Ayckbourns of lying and
disrespecting him, even though he "made [the Ayckbourns] famous," "fund[ed] all the
projects," and "let [the Ayckbourns] take all the credit."  Lee stated that did not feel
comfortable "moving forward" and that he would not take on any "new project[s]" until
they had "talk[ed] it over."  However, in the same communication, Lee stated he was
planning to invest 2 million RMB in new machinery simply because "WP ha[d]
master[ed] the technique of doing it."

34.    On another occasion in February 2018, Lee stated that he was unhappy
financing the enterprise's manufacturing—which he had done for the previous 12
years—and accused WPIL of forcing him "to close … due to unclear accounting."
Later, in July 2018, Lee stated that he did not "feel like [] be[ing] partner[s] with [Gary
Ayckbourn]" and sought to recoup costs for, among other things, a failed attempt to

ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM

1  launch an adult board game that cost the enterprise $51,252.12 in 2009.  WPIL

2  eventually paid for this amount, albeit under protest.

3       35.    In the second quarter of 2019, because of Lee's increasingly erratic

4  behavior, unfounded accusations against WPIL, and repeated threats to shut down the

5  factory, WPIL opened a trade finance facility with HSBC Bank.  This facility was

6  secured by WPIL's accounts receivable and was intended to shift some of the initial

7  financial burdens of product manufacture onto WPIL, expressly in exchange for Lee's

8  agreement that he would continue operating the factory and would continue fulfilling

9  WPIL's purchase orders.  With financing from HSBC Bank, WPIL paid the costs-only

10 invoices from the factory upon shipment to the customer—i.e., before WPIL received

11 payment from its customer—with the remainder being paid within 60 or 90-day terms

12 once WPIL had received its customer's payment.  This arrangement effectively removed

13 Lee's role as initial financier for most transactions and placed the financial risk on

14 WPIL, leaving Lee to receive only the net revenues on the back end.  Again, WPIL only

15 consented to this gratuitous concession because of Lee's threats to close the factory and

16 as a means to secure Lee's agreement to continue fulfilling purchase orders obtained by

17 WPIL, which he gave.

18      36.    Yet despite the foregoing agreement, Lee again threatened to shut down the

19 factory in May 2021.  Around this time, the factory had experienced increased losses

20 attributable to a shortage in semiconductor chips.  WPIL attempted to convince Lee to

21 keep the factory open, but in response, Lee claimed the reduction in manufacturing

22 meant he could not cover all of the factory's salary costs on a monthly basis, which

23 forced the factory to reduce its operations to three-to-four working days per week.  Lee

24 demanded that WPIL cover 40% of these salary losses for three months, but he refused

25 WPIL's request to factor its own staffing costs into the same figure—even though there

26 were enough pending purchase orders to cover the higher costs and still return a profit.

27 WPIL, having no choice but to agree to this demand or otherwise suffer the loss of its

28 customers and entire business, agreed.  Again, WPIL's agreement was expressly

1  predicated on Lee's representation to keep the factory running at full capacity and to

2  fulfill all of WPIL's purchase orders.

3      37.    Between May and November 2021, Lee's request to cover three months of

4  additional costs evolved into a demand for WPIL to cover 40% of salary and labor-

5  related losses at the factory for *all* of 2021 including Chinese taxes, social insurance, and

6  union fees.  Again, WPIL agreed in principle to helping defray some of these losses on

7  the same terms outlined above, but by 2022, WPIL realized that Lee had massively

8  misrepresented the amount of these costs:

9          a.  Upon information and belief, total employee salaries for the factory's

10             staff in China in 2021 totaled $1,021,638.43, with $589,078.88

11             dedicated purely to salaries and the remainder to local social security

12             taxes, union fees, and welfare fees.

13         b.  However, LOL invoiced WPIL for $689,631.83 of *additional* labor-

14             related losses in 2021, which would represent $1,724,079.58 in total

15             labor losses to the factory based on the parties' 60/40 agreement.  Upon

16             information and belief, therefore, Lee inflated his costs by over

17             $700,000.00 to fraudulently extort additional funds from WPIL.

18         c.  WPIL did not discover this discrepancy until approximately March 30,

19             2022 when, as discussed below, Lee provided a high-level summary of

20             2021 operating costs in connection with the Ayckbourns' due diligence

21             efforts to purchase the factory operation from Lee.

22     **C.    *The Ayckbourns Plan to Purchase Lee's Stake in the Enterprise, but Lee***

23         ***Refuses to Provide Financial Information Integral to the Transaction***
           ***While Continuing to Make Unwarranted Threats and Demands of WPIL***

24     38.    Given Lee's intransigence and apparent desire to shutter the factory, the

25  parties began to discuss how WPIL might purchase Lee's assets in the business,

26  allowing them to build on their sustained growth without the volatility from working

27

28

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

1    with Lee.  Indeed, between 2018 and 2021, Lee indicated several times to the

2    Ayckbourns that he wished to retire from the business.

3        39.    In an email dated May 19, 2021, Gary Ayckbourn proposed that WPIL

4    purchase the factory, with Lee remaining only as owner of the land under the factory.

5    However, to do so, Gary Ayckbourn noted that they would require outside investors or

6    bank financing, along with financial information for the target entities.

7        40.    The Ayckbourns soon began planning the financial details of an asset

8    purchase from Lee and the creation of a single corporate entity that would control the

9    entire manufacturing, shipping, and sales process.  WPIL received commitments from

10   outside investment to execute an asset purchase agreement, contingent upon due

11   diligence and a lease agreement from Lee relating to the factory in China.  In their

12   correspondence, the parties anticipated that a deal would be completed by Chinese New

13   Year 2022 (traditional celebrations taking place Jan. 31–Feb. 15, 2022).

14       41.    Lee, however, prevented any realistic possibility of closing this transaction

15   by refusing to comply with standard requests for financial information and due

16   diligence.  Such due diligence was especially necessary given the outside investors' lack

17   of familiarity with Lee, combined with his erratic behavior.  The investors required that

18   any buyout agreement be made contingent upon a standard audit of the assets for

19   purchase, establishing the future business's profitability and conforming to Generally

20   Accepted Accounting Principles (GAAP).  Lee stated that such due diligence was

21   "unnecessary," but upon information and belief, Lee actually refused to provide such

22   information because it would reveal that he had been taking advantage of WPIL for

23   years, including by inflating the factory's costs.  This was demonstrated by the fact that

24   what little information Lee did provide—for example, the labor cost information

25   described above—showed that Lee had not been truthful with WPIL in accounting for

26   the costs and profits of the enterprise over the course of its existence.

27       42.    Nevertheless, at the same time the Ayckbourns were working on the

28   transaction and trying to find ways to close—notwithstanding Lee's refusal to provide

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

basic financial information—Lee continued to demand payment from WPIL for items that Lee had always been responsible to pay according to the parties' 16-year-long course of dealings, such as additional Chinese business taxes and funds to cover alleged depreciation in the Chinese Yuan.  The Ayckbourns informed Lee that they had never agreed to pay for these items, as the parties had always covered their own respective business taxes.  As to the currency issue, Lee had previously requested that WPIL cover short-term losses from currency depreciation.  Eventually, the Ayckbourns showed Lee that, over an 18-month period, he had actually earned a considerable amount of money in total appreciation.  WPIL then offered to cover all currency exchanges, but Lee refused and did not broach the topic again, keeping the appreciated currency to himself.

43.    As an alternative to WPIL agreeing to pay Lee's Chinese taxes, Lee proposed that the tax increase be passed on to customers, which WPIL refused. Regardless, Lee unilaterally instructed the factory to add the tax increase into its invoices without WPIL's consent, meaning that WPIL had no choice in the matter.

44.    In the fall of 2021, Lee gave WPIL an ultimatum that he had instructed the factory to cease manufacture of all products of the enterprise after Chinese New Year 2022—a clear effort to coerce the Ayckbourns into closing the buyout transaction, notwithstanding Lee's refusal to provide the requested due diligence and financial information.  Additionally, Lee took advantage of the fact that the factory was generally the one to set the manufacturing schedule to halt even purchase orders submitted well prior to Chinese New Year.  Lee instructed the factory not to even purchase the component parts for those orders until well into 2022.  The effect was to halt the fulfillment of purchase orders *beginning in November 2021* with no justification whatsoever.  Again, the parties' decades-long course of dealing required the factory to promptly order component parts and begin fulfilling purchase orders immediately upon receipt; payment was not due until the products were manufactured and shipped.

45.    Throughout the fall and winter of 2021 and 2022, the Ayckbourns worked feverishly to consummate the buyout transaction given that Lee's actions had guaranteed

customers would not receive their orders—and the entire business would collapse—if
they did not.  During this time period, the Ayckbourns provided Lee with several
business proposals and plans to account for outstanding purchase orders and shipments
as part of the buyout transaction, so as to placate Lee's demands for compensation.

46.     Lee, by virtue of not having any real historical contact with the customers
of the enterprise, apparently did not know how much future business WPIL was
planning for the coming months.  Upon information and belief, Lee understood that only
$1.5 million in orders were outstanding based only on the purchase orders that had
already been submitted to the factory, but he later discovered that WPIL had received
approximately $6 million in purchase orders from customers.  The Ayckbourns'
business proposals provided Lee with all of this information in good faith and in full
transparency.  Upon information and belief, when Lee learned how much business was
available—and knowing that a buyout would require him to reveal the skeletons in his
closet during due diligence—Lee reversed his plans of retirement and shutting down the
factory in favor of a scheme to convert WPIL's customers and cut WPIL and the
Ayckbourns out of the enterprise entirely.  This would allow Lee to convert all of the
goodwill and investment that WPIL had contributed for the preceding decade(s) to his
own benefit and, correspondingly, destroy WPIL's business.

### D.     *Lee Wrongfully Manufactures a Payment Dispute as an Excuse to Cut WPIL Out of the Business*

47.     Indeed, at the same time that the Ayckbourns were working to salvage the
enterprise and consummate the buyout transaction while keeping the business operating,
Lee continually accused WPIL of not paying its invoices as a blatant pretext to solicit
WPIL's customers directly.  Lee also started to insist that WPIL pay every one of LOL's
invoices by his own unilaterally-determined deadlines, despite the fact that for more than

1  15 years the practice was that WPIL had at least 60-day terms to pay (and frequently

2  longer if WPIL had not yet received payment from the customer).[2]

3      48.    Thus, by preventing fulfillment of WPIL's purchase orders while

4  simultaneously demanding payment on invoices he would not fulfill and threatening to

5  close the factory, Lee unilaterally breached the parties' long-standing course of dealings

6  simply so he could claim WPIL was not paying its invoices (aided, of course, by his

7  original insistence that he would not execute a written agreement with WPIL in favor of

8  a relationship "built on trust").

9      49.    For example, on or about December 9, 2021, Lee sent an email to Gary

10  Ayckbourn, accusing WPIL of complicating the buyout negotiations.  Lee insisted that

11  WPIL wire October and November payments for couriers, moulds, and samples to his

12  personal account—not to the factory or even to LOL—and requiring WPIL to cover

13  increases in costs for the labor shortage in China.  In the same e-mail, Lee stated that he

14  would "finish up all current P.O.s [sic]."  Again, however, by manipulating the

15  manufacturing schedule and instructing the factory not to order component parts for

16  recent purchase orders, Lee was able to unilaterally determine what was "current."

17      50.    On December 22, 2021, Gary Ayckbourn sent an e-mail to Lee, requesting

18  the factory provide overdue manufacturing and shipping schedules for previously placed

19  purchase orders, along with confirmation that the factory had shipped replacement

20  products to a specific customer, WOW Tech, after the factory's previous shipment had

21  contained battery defects with the risk of combustion.  Unbeknownst to Gary, however,

22  and consistent with Lee's plan to obstruct the fulfillment of both past and future

23

24

---

25  [2] Notably, even following WPIL's agreement to obtain a debt facility to advance
26  payment on certain invoices in exchange for Lee's agreement to continue fulfilling
   purchase orders, the same was still predicated on manufacture and shipment of the
27  goods.  In any event, as described below, the lender eventually froze the debt facility
   given Lee's actions in threatening to shut down the factory and delaying/refusing to
28  fulfill purchase orders.

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

1  purchase orders, Lee had already instructed LOL and factory staff not to provide any

2  manufacturing and shipping schedules to WPIL going forward.

3      51.    On or about January 5, 2022, having created leverage over the Ayckbourns

4  by wrongfully delaying and refusing to fulfill purchase orders for WPIL customers, Lee

5  demanded that the pending buyout transaction be revised in his favor to provide him an

6  additional $1 million in consideration, with $2 million of the portion set aside for

7  "goodwill" being paid into a third-party account in Indonesia—which, upon information

8  and belief, constituted Lee's attempt to evade U.S. taxes on the transaction.  Lee

9  represented that this side payment was necessary because otherwise it was not worth him

10  doing the deal.  He also insisted that the transaction be closed immediately without

11  complete due diligence for WPIL or the investors, and that the Ayckbourns sign a side

12  agreement as personal guarantors for the purchase.  These terms had either not

13  previously been contemplated or in fact were directly contrary to terms previously

14  contemplated, further demonstrating Lee's bad faith.

15      52.    At approximately the same time, HSBC Bank, WPIL's debt facility lender,

16  was forced to freeze further disbursements on the facility based on Lee's actions in

17  placing the business on hold.  WPIL advised Lee of this fact, but reaffirmed that WPIL

18  would continue to pay invoices within the terms agreed with customers for invoices and

19  ensure a final, correct balance once a buyout was executed.  Despite that his own actions

20  had caused the debt facility to be frozen and insistent that the lending arrangement had

21  nothing to do with him, Lee continued to unilaterally demand payment of invoices prior

22  to payment by WPIL's customers and before the stated terms within the respective

23  invoices—in a blatant breach of the parties' years-long course of dealing and despite

24  Lee's knowledge that the debt facility had been suspended.

25      53.    Despite Lee's bad faith, on or about January 17, 2022, the Ayckbourns had

26  little choice but to advise Lee that they would agree to waive the "usual due diligence

27  process" if Lee would agree to stagger payment of the transaction's purchase price, with

28

60% of the full purchase price being paid upon execution and the remainder being paid over the following three years.

54.    The same day, Lee responded by e-mail, asking if these terms were final and stating that "if accepted," he would "inform China to proceed [with] all P.O.s."  On or about January 19, 2022, Lee confirmed that the essential terms of the buyout transaction had been agreed and would be forwarded to legal counsel to prepare a draft agreement.  Of course, Lee and the factory had an obligation to fulfill the outstanding purchase orders anyway.  This statement further confirms that Lee wrongfully breached the parties' course of dealing to provide him with leverage in the buyout transaction and to force WPIL to continue paying additional costs and expenses.

55.    On or about February 23, 2022—once staff returned from Chinese New Year vacations—Lee sent an e-mail to his staff, instructing them to "[g]o ahead and take on new P.O.s that [he] previously rejected and order the parts and provide shipping schedule."  Again, this e-mail is clear evidence that Lee had instructed his staff to wrongfully refuse to fulfill purchase orders that he unilaterally "rejected" and to refrain from ordering the component parts so that a manufacturing and shipping schedule could never be confirmed, all to provide him with leverage in the buyout transaction.

56.    On February 25, 2022, Lee confirmed that he was ordering parts for the pending purchase orders and stated that he expected a final buyout agreement to be signed on or before February 28, 2022—only three days later.  At the same time, Lee demanded (1) advance payment for purchase orders placed in November 2021, December 2021, and January 2022, (2) payment of an allegedly outstanding $200,000.00 balance, and (3) that WPIL pay for three other allegedly past-due invoices.  Without any choice in the matter, WPIL paid what it could, despite the fact that (1) the factory had not manufactured or shipped any of the goods identified in the November 2021, December 2021, and January 2022 purchase orders; (2) the $200,000.00 balance was the second installment payment of a $409,760.41 invoice (and Lee was aware that bank restrictions prohibited a single payment); and (3) the allegedly-past-due invoices were

not, in fact, past-due. Between November 2021 and March 3, 2022 (and including a single payment on June 11, 2021), WPIL made $411,258.80 in advance payments to LOL, despite having not received payment from customers for these orders. However, Lee's actions meant that customers would not pay WPIL pursuant to their invoices.

57.    Also around this time, Lee requested that WPIL purchase new computers for LOL staff. Upon information and belief, Lee made this request to ensure that post-buyout, WPIL would have no prior business records, which would have disclosed Lee's historical overcharges and misuse of the enterprise's funds.

58.    Lee then again, inexplicably, instructed his staff to again place all open purchase orders on hold. On or about March 2, 2022, upon inquiry from WPIL, Lee confirmed he had done so because he not received advance payments (to which he was not entitled) for purchase orders from December 2021 and January 2022. Lee also again insisted that the Ayckbourns immediately execute the asset purchase agreement, "otherwise all our previous agreement[s] will become VOID," and he would "pull the plug this week."

59.    On March 4, 2022, Lee sent an email to the Ayckbourns, noting that he would allow all shipments to continue as planned "up to Mar. 15, 2022," with a view to handing over the business on April 1, 2022. However, he insisted that the Ayckbourns wire him payment for the buyout immediately and that due diligence could "be done in one or two days," as it consisted only of "Sales-Cost (outgoing wires + a few employees)=Profit that's it."

60.    On March 16, 2022, the Ayckbourns sent Lee an e-mail stating that they had an executed letter of intent with his investors they could not disclose, as they wished to remain anonymous. The Ayckbourns also said the investors were willing to place asset purchase money into escrow as sign of good faith, provided that (a) Lee agree to a lease for the factory, (b) WPIL receive copies of any patents and related agreements for its products, and (c) WPIL be allowed to conduct a final stock audit. Lee entirely ignored these reasonable requests. Upon information and belief, he did so because he

1  had no intention of proceeding with the buyout transaction at this point—he was already

2  moving to exclude WPIL from the business.

3      61.    On March 24, 2022, having ignored the Ayckbourns' proposal to place

4  funds in escrow and thereafter close the transaction—and still refusing to fulfill virtually

5  all purchase orders dating back to November 2021—Lee demanded that WPIL pay

6  fourteen of LOL's invoices by the following day.  Lee knew that most of these invoices

7  either were not due or that customers had withheld payment based on his actions, and

8  further that the debt facility had been frozen based on his actions.  Lee additionally

9  insisted that the Ayckbourns execute an asset purchase agreement by March 31, 2022, or

10  else he would shut down the factory.

11      62.    On March 28, 2022, WPIL informed Lee again that WPIL would continue

12  to pay outstanding invoices as they became due and WPIL received payment from

13  customers, but WPIL could not make advance payments on the suspended trade facility.

14  WPIL also offered to pay suppliers directly for component parts for products that had

15  yet to be ordered, which Lee refused.  Upon information and belief, Lee refused this

16  arrangement because he had been overcharging WPIL for these parts in previous years.

17      63.    Later that day, Lee informed WPIL that, because WPIL would not pay in

18  advance for goods and the buyout had not been consummated—as a result of his own

19  unreasonable and bad faith conduct—he was shutting the factory down.  Lee also stated

20  that he was requiring that WPIL's customers pay LOL or ALC directly, confirming that

21  he was cutting WPIL out of the business (ironically, LOL now demands double-payment

22  from WPIL in its operative complaint against WPIL in this case, despite having obtained

23  payment directly from the customers without accounting to WPIL for its 40% share of

24  net revenue).  In the same communication, Lee threatened to sue those customers and

25  place liens on their products if they refused payment.

26      64.    Though the Ayckbourns had done everything possible to consummate the

27  buyout despite Lee's intransigence, given his insistence on a factory shut-down, on or

28  about March 30, 2022 WPIL provided Lee with a detailed wind-down plan for the

enterprise, including an overview of outstanding purchase orders and invoices for the parties to reconcile their accounting books.  The plan contemplated Lee's fulfillment of all previously submitted purchase orders—valued at more than $5.6 million—and offering customers the opportunity to place additional, final orders.  WPIL expressly refused any idea that Lee would sue any customers or demand direct payment from customers.  WPIL also asked Lee for a commitment that he would replace a shipment of defective products to WOW Tech (as required given that the defect was attributable to the factory and/or its suppliers, as outlined below), and return all tooling moulds to WPIL's customers.

65.   As of March 30, 2022, Lee and/or his related entities owed WPIL the following debts:

   a.  Repayment of a $200,000.00 loan WPIL provided to LOL, which Lee has repeatedly acknowledged but not repaid.

   b.  Forty percent of net revenue from sales on products to customers Reckitt Benckiser and OhMiBod, which WPIL estimates as $60,000.00.  These two customers paid Lee directly, but Lee did not deliver WPIL's share of the revenue.

   c.  After reconciling its own records, WPIL estimates that Lee has historically overcharged WPIL in violation of the parties' 60/40 agreement, in an amount totaling more than $425,000.00.

**E.   Lee Files the Instant Action as a Pretext to Sever Ties to WPIL**

66.   Lee did not respond to WPIL's wind-down proposal and, instead, filed the instant action via LOL on April 8, 2022.  The sole bases for LOL's unjustified breach of contract action were that WPIL had: (i) allegedly failed to pay three invoices that had a stated due date of March 25, 2022 (Invoices 1512, 1513, and 1514); and (ii) had allegedly failed to pay 40% of his additional labor costs in 2021 (costs WPIL had only agreed to pay if Lee continued fulfilling purchase orders, which he did not, and which it was later discovered that Lee had massively inflated in any event).

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

67.     Of course, Lee himself had breached the parties' course of dealing months prior, including by willfully refusing to fulfill WPIL's purchase orders dating all the way back to *November 2021* and threatening to shut the factory down—in which case, neither those purchase orders nor any others would ever be fulfilled.

68.     LOL's complaint in this action omitted any mention of the context of the parties' long-standing business relationship or the history of the instant dispute.  This was intentional, as WPIL used the complaint solely as a pretext to sever WPIL's ties with its customers.  At the time WPIL answered and filed its original counterclaim, LOL had not served WPIL or its principals, and to WPIL's knowledge, LOL had not even attempted service.  Instead, WPIL received notice of this lawsuit through its customers. Lee had sent the complaint to WPIL's customers in a blatant attempt to prejudice those customers against WPIL and as a pretext to accompany a demand that they begin doing business directly with him.

69.     Since filing the instant action, Lee has refused to work with WPIL in any capacity and has banned his staff from communicating with WPIL.  Instead, Lee has instructed his staff to approach WPIL's customers directly—customers that WPIL had spent years, if not decades, acquiring and servicing—to advise them that they should deal directly with Lee and the factory in exchange for a substantial discount for cutting WPIL out of the picture.  Lee has falsely stated to these customers and others that the Ayckbourns are unethical and untrustworthy, that WPIL refuses to pay its invoices to LOL, and that WPIL owes LOL $2.6 million (notwithstanding that LOL's operative complaint at the time only sought payment of approximately $1.6 million, and even the currently operative complaint only seeks payment of approximately $1.8 million).

70.     Upon information and belief, Lee has informed these customers that he has no plans to retire and that "Wingpow" will remain open indefinitely.

71.     As a result of Lee's actions, many customers who have not received timely deliveries of products have threatened to pursue claims against WPIL.  Customers have also demanded compensation for the late delivery of products.  As of April 5, 2022,

WPIL was owed **$2,222,921.11** in payments that were withheld by customers due to Lee's refusal to fulfill purchase orders and ship products.

72.    Lee has also refused to return tooling moulds and related goods to WPIL, which has paid more than $4.5 million since 2010 on behalf of its customers for their design and fabrication.  While WPIL would return those moulds to the respective customers upon receipt rather than retain them, Lee's refusal to return the moulds is specifically calculated to assist him in tortiously interfering with WPIL's customer relationships and converting the substantial goodwill created by WPIL over decade(s).  Indeed, by keeping the moulds that WPIL designed and paid for, Lee can offer to the customers that he will continue to manufacture their custom products without WPIL's involvement, while at the same time preventing WPIL from working with those customers to find a new manufacturing partner.

73.    On at least one occasion following the initiation of this action, Lee has explicitly refused a customer's direct request to return its moulds based on WPIL's alleged refusal to pay invoices to LOL:

> I am sorry to inform you that I am not going to release your molds to you due to Wing Pow International LTD. U.K. DID NOT pay my outstanding invoices of around $2.6 million.

To be clear, none of the allegedly outstanding invoices had anything to do with this customer's moulds, which were fully paid-for long ago.  There is no colorable argument that the customer should not be entitled to their return, which both the customer and WPIL have demanded.  This is simply another example of the way Lee used the payment dispute he manufactured to drive a wedge between WPIL and its customers.

74.    Ultimately, because of Lee's actions, WPIL—which had been prospectively valued up to **$25 million** upon execution of the parties' buyout—has been rendered effectively worthless.  WPIL has lost all reputation and goodwill garnered over 16 years in business.  No customers will do business with WPIL now that the enterprise has failed to fulfill all of the purchase orders sent to WPIL since November 2021.  In fact, many of

1  WPIL's customers have expressly stated to WPIL that while they desire to continue
2  working with WPIL, they have no choice but to cancel their pending purchase orders
3  with WPIL and raise them directly with LOL.

4        75.    Since learning of Lee's actions, WPIL's potential customers have also
5  cancelled their future orders and projects.  Among those potential customers were (1) an
6  international health and wellness retailer who planned to use WPIL as its supplier for all
7  markets outside of the United States, (2) an international distributor of adult novelties
8  that planned to use WPIL to supply its products for its in-house brand, and (3) a
9  company specializing in contraceptives sold at major U.S. supermarket and pharmacy
10 chains.  WPIL had been planning for many of these projects with potential customers for
11 up to 12 months before Lee stopped all communication with WPIL.  Although these
12 prospective customers previously planned for a years-long business with WPIL, they
13 have expressed now that they will need to find an alternative supplier.  At least two of
14 these customers have explicitly stated to the Ayckbourns that they cannot trust *either*
15 WPIL or LOL, given the risk to their future business.  One prospective customer even
16 noted that they stood to lose millions in market share and retail shelf space because of
17 the unanticipated lack of supply caused by Lee's actions.  Cumulatively, these new
18 opportunities were projected to produce more than $15 million in revenue over the next
19 18 months, but are now worthless.

20          ***F.    Lee's Refusal to Replace Defective Products for WOWTech***

21        76.    As previously described, one of WPIL's longstanding customers is WOW
22 Tech Group and the affiliated WOW Tech Europe GmbH (collectively "WOW Tech").
23 Among the products that WOW Tech has historically ordered from WPIL are Wands by
24 We-Vibe ("Wands").

25        77.    Over a period of months, WPIL supplied 29,016 Wands to WOW Tech.  By
26 January 7, 2021, WPIL had paid all of LOL's invoices associated with these Wands,
27 amounting to $907,495.38.

28

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

78.     However, in early 2021, individual customers alerted WOW Tech that some of these products would smoke when used, which WOW Tech reported to WPIL.  Upon investigation, the culprit was a defective battery used in every single one of the Wands (notwithstanding that reports of smoking and other issues were sporadic).  Based on those reports and concerns, WPIL and Lee committed to replacing these products at no additional cost to WOW Tech.

79.     In 2021, Lee agreed that the enterprise should replace all of these products at no cost to the customer.  He also represented that he would claim the value of the defective products through insurance or, alternatively, seek compensation from the Chinese entity that supplied the defective batteries.  Upon information and belief, Lee never attempted to recoup these costs from either insurance or the supplier, and instead, sought payment from WPIL, which had no obligation at law or by representation that it would pay for the replacements.  Indeed, it has always been Lee's responsibility to source and pay for component goods such as batteries.

80.     Between November 2021 and March 2022, as shipments for the replacement products became increasingly delayed, WOW Tech representatives sought clarification from WPIL about whether any arrangements had been made for delivery.

81.     After numerous attempts to seek confirmation of a shipping destination, an LOL employee responded on December 17, 2021, instructing WPIL to let LOL handle the return shipments because of "customs formalities."  As before, there is no dispute that Lee and his related entities have been paid in full for the Wands.  However, Lee has not shipped *any* of the replacement Wands because of the dispute he manufactured with WPIL between November 2021 and March 2022 regarding payment of the three completely-unrelated invoices identified above.  Indeed, as late as March 29, 2022, Lee continued to provide explicit instructions to LOL employees to withhold shipment of replacement Wands to WOW Tech.

82.     Because of these delays, WOW Tech withheld payment to WPIL on invoices for other products that became due, and has repeatedly threatened to sue WPIL,

notwithstanding that WPIL has no ability to ship the products given Lee's intransigence. WOW Tech's asserted claim against WPIL amounts to at least $2,076,626.34— $780,756.66 of which consists of invoices to WOW Tech for goods shipped to WOW Tech that it refuses to pay based on Lee's misconduct.  WOW Tech has also cancelled its long-term contract with WPIL, and upon information and belief has taken its business directly to the factory given it has no realistic alternative.

## **ALTER EGO ALLEGATIONS**

83.    Upon information and belief, there has existed a unity of interest and ownership between and among Counterdefendants such that any individuality and separateness between or among them has ceased, and such that each is the alter ego of the other, including:

a. Lee has at all relevant times maintained complete control, leadership, management, and operation of LOL and ALC and has intermingled his personal assets with each of these respective entities to suit his convenience.

b. Lee has at all relevant times used the assets of LOL and ALC, for his own use and has caused or will cause their assets to be transferred to him and to one another without adequate consideration.

   i. For example, since at least March 2019, Lee has requested that WPIL pay sums amounting to more than $450,000 to his personal bank account that WPIL would otherwise pay LOL according to their established course of dealing.  The specific invoices include, at minimum: (1) $69,886.67 for tooling moulds related to WOW Tech in August 2019 and (2) $60,401.84 for invoices associated with another customer, Reckitt Benckiser Group.

   ii. Lee has continued to demand that WPIL pay his personal account for obligations relating to the enterprise, especially costs for tooling moulds, product samples, and couriers.  These payments totaled more than $330,000 in 2021, including: (1) a $39,992.18 payment on

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

1    September 23, 2021, (2) a $15,234.38 payment on December 15,

2    2021, and (3) a $20,984.34 on December 13, 2021.

3    iii.    Exclusively for goods sold to customer Ann Summers, a British

4    retailer, Lee has required WPIL to pay invoices from LOL to an ALC

5    account, for no stated or readily apparent reason. Cumulatively, these

6    payments totaled several million U.S. dollars per annum.

7    c.  Upon information and belief, LOL and ALC are mere shells without

8    sufficient independent capital or assets to conduct their business affairs and

9    support their obligations and liabilities attendant to those affairs. Indeed,

10    during the buyout negotiation process, Lee consistently avoided having any

11    independent due diligence or audit conducted on LOL or ALC or any of

12    their respective subsidiaries. Upon information and belief, Lee did so to

13    avoid a true valuation of these entities, and the fact that he routinely

14    demands payment owed to one entity be transferred to his personal

15    account(s) or those belonging to another one of his entities shows that any

16    one or all of those entities could be or become functionally insolvent based

17    upon nothing more than Lee's whim.

18    d.  LOL and ALC are, and at all relevant times, have been, mere shells and

19    instrumentalities through which Lee has carried on his businesses with the

20    intent to avoid the imposition of liability and for the purpose of substituting

21    financially insolvent companies in his place. For example, at the time that

22    Lee had agreed to the key terms of an asset purchase, he requested that the

23    Ayckbourns and their investors transfer the money to a third-party account

24    in Indonesia to avoid paying U.S. taxes, to which the Ayckbourns would not

25    agree.

26    e.  Additionally, upon information and belief, Lee has routinely transferred

27    funds in and out of accounts belonging to these and other non-party entities

28

ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM

1           for the expressly-stated purpose of avoiding taxation by applicable

2           government entities.

3       84.     Upon information and belief, adhering to the corporate fictions of LOL and

4 ALC as distinct persons and legal entities would permit an abuse of the corporate

5 privilege, sanction fraud, and promote injustice, as LOL and ALC have each distributed

6 or will distribute a substantial portion of its assets to Lee and/or to the other without

7 adequate consideration, all for the purpose of avoiding and preventing attachment and

8 execution by creditors of LOL.

9                         **FIRST CLAIM FOR RELIEF**

10              (Breach of Contract – Against All Counterdefendants)

11       85.     WPIL repeats, repleads, and realleges the allegations contained in the

12 foregoing paragraphs and incorporates the same herein.

13       86.     WPIL and Counterdefendants are merchants engaged in the business of

14 selling premium sexual health products.  As described at length above, WPIL and

15 Counterdefendants engaged in a course of dealing over nearly two decades that

16 consisted of a variety of oral, written (e.g., purchase orders and invoices), and implied-

17 by-conduct contracts.  As a general proposition, those contracts collectively required that

18 Counterdefendants would fulfill purchase orders provided to them by WPIL on behalf of

19 WPIL's customers, and payment to Counterdefendants was not due until the goods

20 identified in those purchase orders were manufactured and shipped.

21       87.     WPIL has performed all obligations owed to Counterdefendants in

22 connection with those contracts, except those waived or excused by Counterdefendants'

23 conduct and willful non-performance.

24       88.     Counterdefendants breached that course of dealing and those contracts by,

25 among other things, willfully refusing to manufacture and ship goods identified in WPIL

26 purchase orders dating back to at least November 2021.  Counterdefendants also refused

27 to comply with their agreement to ship replacement Wands to WOW Tech and refused

28

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

1  to return tooling moulds designed by WPIL on behalf of its clients, despite having

2  received full payment for all such Wands and moulds.

3     89.    Counterdefendants' breach of those contracts has caused damage to WPIL

4  in an amount to be proven at trial.

5                    **SECOND CLAIM FOR RELIEF**

6     (Breach of Duty of Good Faith and Fair Dealing – Against All Counterdefendants)

7     90.    WPIL repeats, repleads, and realleges the allegations contained in the

8  foregoing paragraphs, and incorporates the same herein.

9     91.    WPIL and Counterdefendants are merchants engaged in the business of

10  selling premium sexual health products.  As described at length above, WPIL and

11  Counterdefendants engaged in a course of dealing over nearly two decades that

12  consisted of a variety of oral, written (e.g., purchase orders and invoices) and implied-

13  by-conduct contracts.  As a general proposition, those contracts collectively required that

14  Counterdefendants would fulfill purchase orders provided to them by WPIL on behalf of

15  WPIL's customers, and payment to Counterdefendants was not due until the goods

16  identified in those purchase orders were manufactured and shipped.

17     92.    WPIL has performed all obligations owed to Counterdefendants in

18  connection with those contracts, except those waived or excused by Counterdefendants'

19  conduct and willful non-performance.

20     93.    Counterdefendants have willfully breached and frustrated the performance

21  of those contracts via bad-faith conduct that includes, without limitation:

22         a.  repeatedly threatening to shut down the factory and actually instructing

23             the factory to halt the production of goods and fulfillment of purchase

24             orders without justification;

25         b.  using their sole control over the means of production and shipment to

26             coerce WPIL into acts that fell well outside the parties' established

27             course of dealing, including making advance payments for purchase

28

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

1    orders before receiving payment from customers, and paying for costs

2    that were Counterdefendants' responsibility;

3    c.    misrepresenting the cost of labor, parts, utilities, materials, rent, and other

4    overhead to operate the factory, and repeatedly alleging that the factory

5    was losing money when, in actuality, the factory was profiting

6    handsomely from the inflated costs charged to WPIL;

7    d.    refusing, or instructing the factory to refuse, to return tooling moulds,

8    specifications, files, and other proprietary materials belonging to WPIL

9    and its customers upon demand;

10    e.    soliciting WPIL's customers directly, in contravention of the parties'

11    established course of dealing that required and permitted WPIL to

12    establish/service/invoice customers, and offering those customers a

13    discount if they dealt directly with Counterdefendants rather than with

14    WPIL; and

15    f.    disparaging WPIL to its customers by misrepresenting that WPIL had

16    refused and failed to pay its bills and otherwise was the source of the

17    failed relationship between WPIL and Counterdefendants, when in fact it

18    was Counterdefendants' protracted bad faith and efforts to extort WPIL

19    that caused the same.

20    94.    Counterdefendants' conduct described herein was part of an intentional

21    scheme to deny WPIL the benefits under the parties' contract(s), in a brazen effort to

22    increase their own profits at the expense of a long-time business partner.

23    95.    Counterdefendants' bad-faith conduct has caused damage to WPIL in an

24    amount to be proven at trial.

25    **THIRD CLAIM FOR RELIEF**

26    (Interference with Contractual Relations – Against All Counterdefendants)

27    96.    WPIL repeats, repleads, and realleges the allegations contained in the

28    foregoing paragraphs and incorporates the same herein.

-43-

97.     WPIL maintains contracts with its customers pursuant to which it agrees to procure premium adult products.  Immediately following Counterdefendants' repudiation of their business with WPIL and willful refusal to fulfill purchase orders in and after November 2021, WPIL was owed a total of $4,743,518.12 from customers based on submitted purchase orders.  As of April 1, 2022, WPIL was owed a total of $5,612,146.32 from customers based on submitted purchase orders.

98.     Because these purchase orders were forwarded to Counterdefendants as part of the parties' established course of dealing and because of Counterdefendants' awareness of the manner in which WPIL earned revenue (i.e., as a markup on purchase orders sent to Counterdefendants), Counterdefendants knew that WPIL held contractual rights and obligations as to their customers, including the right to earn revenue from the sale of the products Counterdefendants were to manufacture and ship.

99.     Counterdefendants, with full knowledge of the amount of revenue to be earned from such contracts if they could be raised directly with Counterdefendants rather than with WPIL, undertook a deliberate campaign to engineer a payment dispute with WPIL that would provide them with cover to force WPIL and/or its customers to breach those contracts and solicit WPIL's customers directly.  Counterdefendants' actions were thus not the product of lawful, free competition, but of willful subterfuge and bad faith.

100.    Counterdefendants' willful refusal to fulfill purchase orders in and after November 2021—in addition to their complete repudiation of the parties' business relationship in April 2022—in fact caused the breach of WPIL's customer relationships. Counterdefendants then approached those customers directly and offered them a discount if they would do business directly with Counterdefendants instead, cutting WPIL completely out of the picture.  Additionally, Counterdefendants refused to return the tooling moulds for WPIL's customers either to WPIL or to the customers themselves.  WPIL was therefore unable to work with its customers to find alternate manufacturing capacity, as Counterdefendants had wrongfully placed themselves in the only position to be able to manufacture these customers' products.  Ultimately,

-44-

1  Counterdefendants obtained the business of WPIL's long-time customers by coercion
2  and betrayal of their long-time business partner rather than free-market competition.

3      101.   At least two of WPIL's largest customers—customers that owed WPIL at
4  least $2,171,035.02 for products ordered from WPIL at the time of Counterdefendants'
5  misconduct—have represented that they plan to withhold all further payment to WPIL
6  based on Counterdefendants' refusal to manufacture and ship products ordered through
7  WPIL.  Those customers also indicated that, while their preference was to do business
8  with WPIL, they had no choice but to re-raise their purchase orders directly with
9  Counterdefendants.  Thus, WPIL has lost those customers' business permanently.  Upon
10  information and belief, other WPIL customers have begun to do business directly with
11  Counterdefendants as well.

12      102.   Counterdefendants' tortious conduct has caused damage to WPIL in an
13  amount to be proven at trial.

14                    **FOURTH CLAIM FOR RELIEF**
15  (Interference with Prospective Economic Advantage – Against All Counterdefendants)

16      103.   WPIL repeats, repleads, and realleges the allegations contained in the
17  foregoing paragraphs and incorporates the same herein.

18      104.   WPIL maintains contracts with its customers pursuant to which it agrees to
19  procure premium sexual health products.  Those contracts are the result of years of
20  customer development, relationship-building, marketing and outreach conducted by
21  WPIL and its employees since its formation in 2006.  WPIL has therefore garnered
22  substantial goodwill and reputation in the international sexual health industry.  Based on
23  this long history, WPIL reasonably expected that it would not only renew contracts with
24  existing customers but would expand its business by obtaining new customers in the
25  near- and long-term.

26      105.   Among other things, WPIL expected either to open new customer accounts
27  or expand business with a major European retailer ("Company A"), a female-focused
28  healthcare company ("Company B"), a German medical company, a medical skincare

company, and one of the largest adult-product retailers in the U.S., among others. Company A is a global leader in prenatal and baby care, as well as children's toys. WPIL had worked with Customer A for more than 12 months and was weeks away from accepting a large initial order on a new and exclusive line of sexual wellness products that would be marketed and sold in pharmacy and mainstream retail stores globally. As to Company B, this prospective customer had previously manufactured its products within the United States and planned to transition all of its production to WPIL in 2022 and 2023. Through these commitments, among others, WPIL anticipated expanding its business beyond the adult retail and novelty industry in the immediate future.

106.  Again, as a result of Counterdefendants' awareness of WPIL's customer relationships and deliberate campaign to cause WPIL to terminate its business relationships, WPIL has lost all of its current and prospective customers. Counterdefendants acted willfully and in bad faith to deprive WPIL of its opportunities for further growth and to steal those opportunities for itself.

107.  Indeed, without the ability to procure the goods that were Counterdefendants' responsibility to manufacture and ship, no current or prospective customer has any reason to work with WPIL now or in the future. WPIL's current and prospective customers, including Company A and Company B among others, have explicitly advised WPIL that they are either freezing all business with WPIL or are taking their business to other producers, including to Counterdefendants themselves. Moreover, because Counterdefendants refused to return the tooling moulds for WPIL's current/past customers either to WPIL or to the customers, WPIL was unable to work with those customers to find alternate manufacturing capacity. Counterdefendants have thus wrongfully ensured that WPIL's customers will be required to do business with them rather than begin the entire product design and tooling process over again with another factory.

108.  Prior to Counterdefendants' misconduct, WPIL's internal business projections suggested that it would increase its total revenue by $10 million year-over-

year and its profit by $3 million year-over-year.  WPIL was also valued at between approximately $20 million and $25 million as part of the buyout negotiations initiated prior to Counterdefendants' misconduct.  Now, all of that business is gone and WPIL's value as a business entity has been completely wiped out.

109.   Counterdefendants' tortious conduct has caused damage to WPIL in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty – Against All Counterdefendants)

110.   WPIL repeats, repleads, and realleges the allegations contained in the foregoing paragraphs and incorporates the same herein.

111.   In addition or in alternative to the breach of contract theories pled above, WPIL and Counterdefendants were engaged in a joint business enterprise in which all contributed in different ways to the management and the maximization of the profits of the enterprise, all shared in the profits of the enterprise, and all held themselves out to customers and other entities as a single enterprise.

112.   Accordingly, Counterdefendants owed fiduciary duties of loyalty, honesty, and care to WPIL in the course of their dealings with one another.

113.   Indeed, WPIL and Counterdefendants had developed a unique relationship requiring trust and confidence in one another over the course of nearly two decades engaged in this enterprise.  Counterdefendants relied on WPIL to procure and service customers for the enterprise, and WPIL relied on Counterdefendants to manufacture and ship the goods that the customers ordered.  Indeed, the nature of the enterprise and course of dealings between the parties meant that WPIL would only be paid by its customers if Counterdefendants held up their end of the bargain to manufacture and ship those goods; conversely, if Counterdefendants refused to do so, customers would have no reason to deal with WPIL, and WPIL would have no value as a business.  WPIL's dependency on Counterdefendants to conduct their portion of the enterprise with honesty

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

and diligence was well known to Counterdefendants.  In fact, Counterdefendants used this knowledge to betray WPIL, as described at length herein.

114.    WPIL also relied on Counterdefendants to accurately account for their costs of manufacture, given that those costs formed the basis for the factory's invoices and that the parties split revenues earned net of those costs 60/40.  If Counterdefendants wrongfully inflated their costs to WPIL, Counterdefendants could (and, upon information and belief, did) obtain 100% of the corresponding revenue without accounting to WPIL for the same.

115.    WPIL also relied on Counterdefendants to possess in good faith, on behalf of WPIL and its customers, the tooling moulds and related specifications, files and other proprietary materials necessary to manufacture the goods of the enterprise.  Indeed, WPIL and the customers designed and paid for those materials, not Counterdefendants.

116.    Counterdefendants engaged in multiple willful and nefarious breached of their fiduciary duties to WPIL, including, without limitation, via the following acts:

    a. repeatedly threatening to shut down the factory and actually instructing the factory to halt the production of goods and fulfillment of purchase orders without justification;

    b. using their sole control over the means of production and shipment to coerce WPIL into acts that fell well outside the parties' established course of dealing, including making advance payments for purchase orders before receiving payment from customers and paying for costs that were Counterdefendants' responsibility;

    c. misrepresenting the cost of labor, parts, utilities, materials, rent, and other overhead to operate the factory, and repeatedly alleging that the factory was losing money when, in actuality, the factory was profiting handsomely from the inflated costs charged to WPIL;

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

    d.  refusing, or instructing the factory to refuse, to return tooling moulds, specifications, files, and other proprietary materials belonging to WPIL and its customers upon demand;

    e.  soliciting WPIL's customers directly, in contravention of the parties' established course of dealing that required and permitted WPIL to establish/service/invoice customers, and offering those customers a discount if they dealt directly with Counterdefendants rather than with WPIL; and

    f.  disparaging WPIL to its customers by misrepresenting that WPIL had refused and failed to pay its bills and otherwise was the source of the failed relationship between WPIL and Counterdefendants, when in fact it was Counterdefendants' protracted bad faith and efforts to extort WPIL that caused the same.

117.  Counterdefendants undertook this and other conduct intentionally, fraudulently, maliciously, and with reckless disregard for WPIL's welfare, always placing their own interests in maximizing profits ahead of WPIL's welfare and of its rights and entitlement to be dealt with in a lawful manner in these transactions.

118.  As a direct and proximate result of the foregoing breach of fiduciary duties, WPIL suffered damages in an amount to be proven at trial in this matter.

## SIXTH CLAIM FOR RELIEF

### (For an Accounting – Against All Counterdefendants)

119.  WPIL repeats, repleads, and realleges the allegations contained in the foregoing paragraphs and incorporates the same herein.

120.  In addition or in alternative to the breach of contract theories pled above, WPIL and Counterdefendants were engaged in a joint business enterprise in which all contributed in different ways to the management and the maximization of the profits of the enterprise, all shared in the profits of the enterprise, and all held themselves out to customers and other entities as a single enterprise.

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**

121.   Because of Counterdefendants' financial secrecy and the trust WPIL placed in Counterdefendants to account for the revenues, costs and other financial information pertaining to the enterprise accurately and honestly, WPIL is unable to ascertain the extent to which Counterdefendants have overcharged for their share of the parties' net revenue, inflated additional costs and expenses, and otherwise misused the enterprise's funds.

122.   Accordingly, WPIL is entitled to an equitable accounting by which Counterdefendants shall be required to render a comprehensive account of their actions pertaining to the enterprise and for the recovery of any balance due to WPIL.

123.   Counterdefendants shall also be required to provide WPIL with access to books and records relating to the business of the enterprise, including evidence of any entity or account in which funds of the enterprise may have been illicitly diverted, including, without limitation:

    a.  All financial accounts and financial operating information (such as profit and loss statements, balance sheets, and cash flow statements) pertaining to LOL, ALC, and their subsidiaries;

    b.  All financial accounts pertaining to Lee or his family members, including accounts in foreign jurisdictions, which upon information and belief include accounts in China, Indonesia and Hong Kong; and

    c.  All financial accounts pertaining to Lee's other businesses, including Top Cat Toys, or the sale of either business.

## SEVENTH CLAIM FOR RELIEF

(For Defamation – Against All Counterdefendants incl. Lee Personally)

124.   WPIL repeats, repleads, and realleges the allegations contained in the foregoing paragraphs and incorporates the same herein.

125.   By stating to third parties, including WPIL's customers, that for example WPIL "DID NOT pay [Counterdefendants'] outstanding invoices of around $2.6 million" or otherwise breached the enterprise's course of dealings, Lee, on behalf of

1  Counterdefendants and in his own personal capacity, published false and misleading

2  statements of fact about WPIL without privilege.

3      126.   Upon information and belief, Lee published these false and misleading

4  statements of fact intentionally, so as to harm WPIL in its business and portray WPIL as

5  the guilty party to its customers, when in fact it was Counterdefendants whose conduct

6  caused those customers harm.  At minimum, Lee should have known that publishing

7  these false and misleading statements of fact to WPIL's customers would harm WPIL in

8  its business.

9      127.   Because Lee's false and misleading statements caused harm to WPIL in its

10 trade or business, they constitute defamation *per se*.  Alternatively, however, WPIL was

11 damaged by Lee's false and misleading statements because WPIL's customers stopped

12 doing business with WPIL as a result.

## EIGHTH CLAIM FOR RELIEF

### (For Receiving Stolen Property – Against All Counterdefendants)

15     128.   WPIL repeats, repleads, and realleges the allegations contained in the

16 foregoing paragraphs and incorporates the same herein.

17     129.   As described at length herein, Lee diverted assets of the Wingpow

18 enterprise for his own benefit without accounting to WPIL for its 40% share of net

19 revenues.  Such conduct constitutes a violation of California Penal Code § 496(a).  *Siry*

20 *Inv., L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 513 P.3d 166 (2022).

21     130.   WPIL has suffered actual damages in an amount to be proven at trial in this

22 matter and is further entitled to treble damages, costs, and attorneys' fees.

## NINTH CLAIM FOR RELIEF

### (For Contribution and/or Indemnity – Against All Counterdefendants)

25     131.   WPIL repeats, repleads, and realleges the allegations contained in the

26 foregoing paragraphs and incorporates the same herein.

27     132.   As described at length herein, numerous WPIL customers have asserted

28 legal claims against WPIL and/or have refused to pay money due to WPIL because of

misconduct attributable to Counterdefendants; including but not limited to WOW Tech's purported claim against WPIL for $2,076,626.34 based on Counterdefendants' refusal to fulfill their obligations relating to the Wands.

133.   Counterdefendants are required to compensate WPIL and/or its customers for such harms suffered as a result of their misconduct.

## **PRAYER FOR RELIEF**

WHEREFORE, WPIL respectfully requests the Court grant the following relief:

1.     Award WPIL general and special damages in excess of $25 million in an amount to be proven at trial;

2.     Award WPIL pay exemplary and/or punitive damages in an amount sufficient to deter Counterdefendants in the future from engaging in the intentional misconduct and omissions complained of herein;

3.     Order an equitable accounting of Counterdefendants' business(es);

4.     Award WPIL its reasonable costs and attorneys' fees in pursuing this Counterclaim;

5.     Award WPIL pre-judgment and post-judgment interest as permitted by any applicable law; and/or

6.     Award WPIL such other and further relief as the Court may deem just and equitable.

## **DEMAND FOR JURY TRIAL**

WPIL hereby demands a jury trial on all claims in this Counterclaim as permitted by law.

Dated:  September 14, 2022              WARGO & FRENCH LLP

                                        By:  */s Jeff Williams*
                                             JEFFREY N. WILLIAMS
                                             BRANDON R. PARRISH

                                        Attorneys for Defendant/Counterclaimant
                                        Wingpow International Ltd.

**ANSWER TO FAC AND FIRST AMENDED COUNTERCLAIM**