1  DAVID M. PERNINI (*pro hac vice*)
   dpernini@wfslaw.com
2  JEFFREY N. WILLIAMS (SBN 274008)
   jwilliams@wfslaw.com
3  BRANDON R. PARRISH (*pro hac vice*)
   bparrish@wfslaw.com
4  WARGO, FRENCH & SINGER LLP
5  601 S. Figueroa St., Suite 4625
   Los Angeles, CA 90017
6  Tel: (310) 853-6300 | Fax: (310) 853-6333

7  Attorneys for Defendant/Counterclaimants Gary and Mark Ayckbourn

8

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| Line One Laboratories Inc. (USA), a California corporation, | Case No. 2:22-cv-02401-FMO |
| Plaintiff, | **ANSWER TO SECOND AMENDED COMPLAINT & COUNTERCLAIM BY DEFENDANTS AND COUNTERCLAIMANTS GARY AND MARK AYCKBOURN** |
| v. | |
| Wingpow International Limited, a private limited company organized in the United Kingdom; Gary Ayckbourn, an individual; Mark James Ayckbourn, an individual; and DOES 1-10, inclusive, | *DEMAND FOR JURY TRIAL* |
| | SAC filed: November 17, 2022 |
| Defendants. | Hon. Fernando M. Olguin |
| And Related Counterclaims. | |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants Gary Ayckbourn and Mark Ayckbourn ("Defendants" or the "Ayckbourns") hereby answer the Second Amended Complaint ("FAC") of Plaintiff Line One Laboratories Inc. ("Plaintiff" or "LOL") as follows:

## THE PARTIES

1.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 of the Second Amended Complaint and therefore deny those allegations.

2.      In response to Paragraph 2 of the Second Amended Complaint, Defendants state that Wingpow International Ltd. ("WPIL") is a private limited company organized under the laws of the United Kingdom with a registered office address in Witney, Oxfordshire, England.  Defendants deny the remaining allegations in Paragraph 2 of the Second Amended Complaint.

3.      In response to Paragraph 3 of the Second Amended Complaint, Defendants state that Gary Ayckbourn is British citizen domiciled in the United Kingdom. Defendants deny the remaining allegations in Paragraph 3 of the Second Amended Complaint.

4.      In response to Paragraph 4 of the Second Amended Complaint, Defendants state that Mark James Ayckbourn is a British citizen domiciled in the United Kingdom. Defendants deny the remaining allegations in Paragraph 4 of the Second Amended Complaint.

5.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 of the Second Amended Complaint and therefore deny those allegations.

6.      In response to Paragraph 6 of the Second Amended Complaint, Defendants state that Gary Ayckbourn is a director and Secretary of WPIL.  Defendants deny the remaining allegations in Paragraph 6 of the Second Amended Complaint.

7.      In response to Paragraph 7 of the Second Amended Complaint, Defendants state that Mark James Ayckbourn is a director of WPIL.  Defendants deny the remaining allegations in Paragraph 7 of the Second Amended Complaint.

8.      In response to Paragraph 8 of the Second Amended Complaint, Defendants admit that Gary Ayckbourn and Mark James Ayckbourn, among others, are principals of WPIL and contribute to business decisions made on WPIL's behalf.  Defendant also admits and states that WPIL and LOL maintained a years-long business relationship until that relationship was unilaterally and wrongfully breached by LOL.  Defendants deny the remaining allegations in Paragraph 8 of the Second Amended Complaint, including that WPIL is a predecessor-in-interest to LOL.

9.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9 of the Second Amended Complaint and therefore deny those allegations.

10.     Defendants state that the allegations in Paragraph 10 of the Second Amended Complaint are merely legal conclusions that do not necessitate a response.  To the extent any response is necessary, Defendants deny the allegations in Paragraph 10 of the Second Amended Complaint.

11.     Defendants state that the allegations in Paragraph 11 of the Second Amended Complaint are merely legal conclusions that do not necessitate a response.  To the extent any response is necessary, Defendants deny the allegations in Paragraph 11 of the Second Amended Complaint.

12.     Defendants state that the allegations in Paragraph 12 of the Second Amended Complaint are merely legal conclusions that do not necessitate a response.  To the extent any response is necessary, Defendants deny the allegations in Paragraph 12 of the Second Amended Complaint.

13.     Defendants state that the allegations in Paragraph 13 of the Second Amended Complaint are merely legal conclusions that do not necessitate a response.  To

1  the extent any response is necessary, Defendants deny the allegations in Paragraph 13 of

2  the Second Amended Complaint.

3  <u>**JURISDICTION AND VENUE**</u>

4  14.    Defendants admit the allegations in Paragraph 14 of the Second Amended

5  Complaint.

6  15.    Defendants deny the allegations in Paragraph 15 of the Second Amended

7  Complaint.

8  16.    Because the Court has found that it has personal jurisdiction over the

9  Defendants, no response to Paragraph 16 is required.  To the extent any response is

10  required and for the avoidance of doubt, Defendants deny that the Court has personal

11  jurisdiction over them and incorporate by reference their allegations and arguments in

12  response as stated in their motion to dismiss the Second Amended Complaint and related

13  briefing.

14  17.    Defendants deny the allegations in Paragraph 17 of the Second Amended

15  Complaint.

16  <u>**BACKGROUND FACTS**</u>

17  18.    Defendants are without knowledge or information sufficient to form a belief

18  as to the truth of the allegations contained in Paragraph 18 of the Second Amended

19  Complaint and therefore deny those allegations.

20  19.    In response to the allegations in Paragraph 19 of the Second Amended

21  Complaint, Defendants state as follows: Since 2006, WPIL, in conjunction with LOL,

22  has been an international seller of sexual health products.  WPIL is responsible for all

23  administrative, design, marketing, and customer-facing aspects of the business.  The

24  parties' generally-established course of dealings is as follows: Upon receipt of a

25  purchase order from a customer, WPIL sends the purchase order to LOL via its wholly-

26  owned factory in China, which confirms receipt, orders the component parts, and

27  prepares a manufacturing schedule.  After WPIL confirms the manufacturing schedule

28  with the customer, the factory begins the manufacturing process.  Once production is

complete, the factory prepares an invoice for the cost of manufacturing the goods including parts, labor, and overhead, and arranges shipment to the customer, usually at the customer's expense.  Upon shipment, the factory provides WPIL with a packing list and proof of delivery, LOL with the invoice for costs, and WPIL with a corresponding version of the same.  Around the same time, WPIL prepares an invoice to the customer for the amount of the factory's invoice plus an additional markup for overhead and profit in accordance with its contract with the customer (sometimes 30%, though sometimes a different amount).  LOL then prepares an invoice to WPIL for the amount of the factory's invoice plus 60% of the markup to the customer.  LOL's invoice contains payment terms generally requiring payment within 60-to-90 days, though LOL accepted payment thereafter in instances when WPIL had not received timely payment from the customer and on other occasions based on the parties' agreements.  This course of dealing between the parties had been in place for over *fifteen years* as a mechanism for WPIL and LOL to split the earnings from the manufacture and sale of goods of the enterprise until LOL and its principal and related entities breached that course of dealings in a variety of ways, including by instructing the factory to refuse to fulfill purchase orders from WPIL and to deal directly with WPIL's customers, cutting WPIL out of the business altogether.  Defendants deny all allegations in Paragraph 19 of the Second Amended Complaint that are inconsistent with the foregoing.

20.    In response to Paragraph 20 of the Second Amended Complaint, Defendant incorporates by reference its response to Paragraph 19 of the Second Amended Complaint and deny all allegations inconsistent therewith.

21.    In response to Paragraph 21 of the Second Amended Complaint, Defendant incorporates by reference its response to Paragraph 19 of the Second Amended Complaint and deny all allegations inconsistent therewith.

22.    In response to Paragraph 22 of the Second Amended Complaint, Defendant incorporates by reference its response to Paragraph 19 of the Second Amended Complaint and deny all allegations inconsistent therewith.

23.     In response to Paragraph 23 of the Second Amended Complaint, Defendant incorporates by reference its response to Paragraph 19 of the Second Amended Complaint and adds that the parties agreed certain customers would pay LOL directly, and LOL would be required to pay WPIL 40% of the agreed-upon markup.  WPIL is without sufficient knowledge and information to form a belief as to any payments between LOL and the factory and deny any remaining allegations in Paragraph 23 of the Second Amended Complaint.

24.     In response to Paragraph 24 of the Second Amended Complaint, Defendant states that in or around May 2021, LOL's principal Calvin Spencer Lee a/k/a Budiman Lee ("Lee") advised WPIL that he planned to close the factory because, due to supply chain issues, there was a shortage of certain manufacturing components.  WPIL asked that LOL keep the factory running and—without any choice in the matter given that Lee otherwise would have shuttered the factory and destroyed WPIL's business—agreed to Lee's demand that it pay forty percent (40%) of "labour losses," as that term was used between the parties, for the duration of that shortage in order to keep the factory fully operational and the staff working and paid.  However, LOL still reduced the working days at the factory and intermittently started and halted operations altogether as a means of exerting leverage over WPIL—frequently refusing to fulfill WPIL's purchase orders at all.  Upon information and belief, neither LOL nor ZWEN was subjected to any liability for labor or product liability claims for the reasons described in this paragraph. WPIL denies any allegations that are inconsistent with the foregoing.

## FIRST CAUSE OF ACTION

### (Against All Defendants for Breach of Contract)

25.     Defendants repeat their statements, admissions and denials for the allegations contained in Paragraphs 1 through 24 of the Second Amended Complaint, inclusive, and incorporates the same herein.

26.     In response to Paragraph 26 of the Second Amended Complaint, Defendant incorporates by reference its response to Paragraph 19 of the Second Amended Complaint and deny all allegations inconsistent therewith.

27.     Defendants deny the allegations in Paragraph 27 of the Second Amended Complaint.

28.     Defendants deny the allegations in Paragraph 28 of the Second Amended Complaint.

29.     Defendants deny the allegations in Paragraph 29 of the Second Amended Complaint.

30.     In response to the allegations in Paragraph 30 of the Second Amended Complaint, Defendants state that well prior to April 5, 2022, LOL had repeatedly directed the factory to hold and to not fulfill purchase orders provided by WPIL's customers, while simultaneously threatening to shut the factory down in its entirety. LOL had also demanded, in connection with the parties' failed buyout arrangement, that WPIL transfer customer payments directly to LOL and have the Ayckbourns sign as personal guarantors on outstanding debts.  In light of the foregoing, WPIL reasonably requested that LOL provide assurances that it intended to cure its prior breaches by directing the factory to fulfill purchase orders dating back to the fall of 2021—which LOL refused.  Defendants deny all allegations in Paragraph 30 of the Second Amended Complaint that are inconsistent with the foregoing.

31.     Defendants deny the allegations in Paragraph 31 of the Second Amended Complaint.

## SECOND CAUSE OF ACTION

### (Against All Defendants for Goods Sold and Delivered)

32.     Defendants repeat their statements, admissions and denials for the allegations contained in Paragraphs 1 through 31 of the Second Amended Complaint, inclusive, and incorporates the same herein.

33.     Defendants deny the allegations in Paragraph 33 of the Second Amended Complaint.

34.     Defendants deny the allegations in Paragraph 34 of the Second Amended Complaint.

## **THIRD CAUSE OF ACTION**

### **(Against WPIL, Gary Ayckbourn, and Mark Ayckbourn for Fraud)**

35.     Defendants repeat their statements, admissions and denials for the allegations contained in Paragraphs 1 through 34 of the Second Amended Complaint, inclusive, and incorporates the same herein.

36.     In response to Paragraph 36 of the Second Amended Complaint, Defendants admit that, in or around January or February 2021, Gary Ayckbourn and Lee communicated several times via Skype and through email about the purported shortage of microchips and admits that, during those conversations, Lee stated that the price of microchips had increased and asked Gary Ayckbourn to increase the sale prices of OEM goods.  Defendants deny the remaining allegations of Paragraph 36.

37.     In response to Paragraph 37 of the Second Amended Complaint, Defendants admit that, at one point, Lee suggested that the factory should work fewer days per week.  Defendants deny the remaining allegations of Paragraph 37.

38.     Defendants deny the allegations in Paragraph 38 of the Second Amended Complaint.

39.     In response to Paragraph 39 of the Second Amended Complaint, Defendant incorporates by reference its response to Paragraph 24 of the Second Amended Complaint and deny all allegations inconsistent therewith.

40.     In response to Paragraph 40 of the Second Amended Complaint, Defendant incorporates by reference its response to Paragraph 24 of the Second Amended Complaint and deny all allegations inconsistent therewith.

41.     In response to Paragraph 41 of the Second Amended Complaint, including subparagraphs (a) through (j), Defendants admit that Gary Ayckbourn and Lee

corresponded by email repeatedly in 2021 and 2022. Defendants state that these emails speak for themselves and deny any allegations inconsistent with their contents.

42. In response to Paragraph 42 of the Second Amended Complaint, Defendants admit that Gary and Mark Ayckbourn, in their capacities as principals of WPIL, met with Lee in November 2021 and states the following. Although WPIL agreed to pay its portion of the labor losses for the months where factory production was limited and was able to pay, it did not do so when Lee demanded because (i) the parties contemplated payment of labor expenses as part of the proposed buyout of the factory, (ii) Lee's represented figures for labor costs were contradictory and unsubstantiated, (iii) Lee demanded that WPIL pay for additional months of losses than the parties agreed, (iv) Lee continued to threaten to halt production in November 2021 and onward, despite the parties' agreement, and (v) LOL had not prepared or sent any invoice for labor to WPIL. WPIL deny any allegations inconsistent with the foregoing.

43. Defendants deny the allegations in Paragraph 43 of the Second Amended Complaint.

44. In response to Paragraph 44 of the Second Amended Complaint, Defendants admit that Mark Ayckbourn was aware of the parties' agreement regarding labor expenses, incorporates its response to Paragraph 24 of the Second Amended Complaint, and deny any remaining allegations.

45. Defendants deny the allegations in Paragraph 45 of the Second Amended Complaint.

46. Defendants deny the allegations in Paragraph 46 of the Second Amended Complaint.

47. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47 of the Second Amended Complaint and therefore deny those allegations.

48. Defendants deny the allegations in Paragraph 48 of the Second Amended Complaint.

**FOURTH CAUSE OF ACTION**

**(Against WPIL, Gary Ayckbourn, and Mark Ayckbourn for**

**Negligent Misrepresentation)**

49.     Defendants repeat their statements, admissions and denials for the allegations contained in Paragraphs 1 through 48 of the Second Amended Complaint, inclusive, and incorporates the same herein.

50.     Defendants deny the allegations in Paragraph 50 of the Second Amended Complaint.

**FIFTH CAUSE OF ACTION**

**(Against All Defendants for Conversion)**

51.     Defendants repeat their statements, admissions and denials for the allegations contained in Paragraphs 1 through 50 of the Second Amended Complaint, inclusive, and incorporates the same herein.

52.     Because the Court has dismissed LOL's Fifth Cause of Action with prejudice, no response to Paragraph 52 is required.

53.     Because the Court has dismissed LOL's Fifth Cause of Action with prejudice, no response to Paragraph 53 is required.

54.     Because the Court has dismissed LOL's Fifth Cause of Action with prejudice, no response to Paragraph 54 is required.

55.     Because the Court has dismissed LOL's Fifth Cause of Action with prejudice, no response to Paragraph 55 is required.

56.     Because the Court has dismissed LOL's Fifth Cause of Action with prejudice, no response to Paragraph 56 is required.

**SIXTH CAUSE OF ACTION**

**(Against All Defendants for Breach of Fiduciary Duty)**

57.     Defendants repeat their statements, admissions and denials for the allegations contained in Paragraphs 1 through 56 of the Second Amended Complaint, inclusive, and incorporates the same herein.

-9-

58.   Defendants deny the allegations of Paragraph 57.

59.   Defendants deny the allegations of Paragraph 58.

60.   Defendants deny the allegations of Paragraph 59 and responds to the allegations in its subparts as follows:

    (i)    Denied;

    (ii)   Denied;

    (iii)  Because the Court has dismissed this allegation with prejudice, no response is required;

    (iv)   Because the Court has dismissed this allegation with prejudice, no response is required;

    (v)    Because the Court has dismissed this allegation with prejudice, no response is required;

    (vi)   Because the Court has dismissed this allegation with prejudice, no response is required.

    (vii)  Defendants admit that WPIL mistakenly and innocently represented to Lee in March 2022 that approximately $68,000 of invoices had been paid, but subsequently learned that the payment had not gone through, and deny any remaining allegations.

61.   Defendants deny the allegations in Paragraph 61 of the Second Amended Complaint.

62.   Defendants deny the allegations in Paragraph 62 of the Second Amended Complaint.

## **SEVENTH CAUSE OF ACTION**

### **(Against All Defendants Violations of California Penal Code Section 496)**

63.   Defendants repeat their statements, admissions and denials for the allegations contained in Paragraphs 1 through 62 of the Second Amended Complaint, inclusive, and incorporates the same herein.

64.     Because the Court has dismissed LOL's Seventh Cause of Action with
prejudice, no response to Paragraph 64 is required.

65.     Because the Court has dismissed LOL's Seventh Cause of Action with
prejudice, no response to Paragraph 65 is required.

66.     Because the Court has dismissed LOL's Seventh Cause of Action with
prejudice, no response to Paragraph 66 is required.

## EIGHTH CAUSE OF ACTION

### (Against All Defendants for Imposition of a Constructive Trust)

67.     Defendants repeat their statements, admissions and denials for the
allegations contained in Paragraphs 1 through 66 of the Second Amended Complaint,
inclusive, and incorporates the same herein.

68.     Defendants deny the allegations of Paragraph 68 of the Second Amended
Complaint.

69.     Defendants deny the allegations of Paragraph 69 of the Second Amended
Complaint.

Defendants deny any and all allegations not specifically addressed herein and
deny LOL is entitled to any relief in this matter, including the relief sought in the Second
Amended Complaint.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof where it otherwise rests with LOL,
Defendants allege the following affirmative and other defenses:

### First Affirmative Defense

LOL's Complaint, and each and every cause of action alleged therein, fails to state
facts sufficient to constitute a claim for relief.

### Second Affirmative Defense

LOL's claims are barred, in whole or in part, because Defendants have acted in
good faith at all times.

Third Affirmative Defense

LOL has failed to take reasonable steps to reduce or minimize the damages sought to be recovered in this case.

Fourth Affirmative Defense

LOL owes money to Defendants and/or has been paid its alleged debts directly by WPIL's customers and, and as a result, any debts allegedly owed by Defendants to LOL are offset by such sums.

Fifth Affirmative Defense

LOL's claims are barred, in whole or in part, because LOL failed to comply with the terms of the parties' contract(s), implied contract(s), and/or established course of dealing.

Sixth Affirmative Defense

LOL's claims are barred, in whole or in part, because Defendants substantially complied with all material requirements of the valid, enforceable contract(s) at issue.

Seventh Affirmative Defense

Defendants allege that LOL has suffered no losses or damages as a result of Defendants' alleged conduct, or any such losses or damages were *de minimis*.

Eighth Affirmative Defense

LOL's claims are barred, in whole or in part, under the equitable doctrines of waiver, estoppel, laches, or unclean hands.

Ninth Affirmative Defense

LOL's claims are barred, in whole or in part, because LOL itself breached the parties' contract(s) or committed anticipatory breach, or because LOL itself breached its fiduciary duty to Defendants, or because LOL failed to bring about a condition precedent to Defendants' performance, or because Defendants' performance was excused, frustrated or prevented by LOL's conduct.

1                       <u>Tenth Affirmative Defense</u>

2        To the extent Defendants were negligent, which Defendants expressly deny,

3 LOL's claims are barred in whole or in part, or LOL's recovery should be limited, under

4 the doctrines of contributory and/or comparative negligence.

5                     <u>Eleventh Affirmative Defense</u>

6        Defendants' alleged misrepresentations were not factual in nature and are

7 therefore inactionable, or any alleged oral misrepresentations are contrary to the express

8 terms of the parties' contract(s) and/or established course of dealing.

9                      <u>Twelfth Affirmative Defense</u>

10        LOL's claims are barred by the applicable statute of limitations.

11                    <u>Thirteenth Affirmative Defense</u>

12        Defendants' alleged agreements were procured by coercion, duress, and/or

13 breach of fiduciary duty in that LOL knew that Defendants' business was dependent on

14 its manufacturing relationship with LOL, and thus wrongfully threatened to close the

15 factory if Defendants did not agree.

16                   <u>Fourteenth Affirmative Defense</u>

17        Defendants' alleged agreements were procured by fraud in that LOL promised to

18 maintain the operation of the factory in exchange for Defendants' alleged agreements,

19 but upon information and belief, had no intent to keep that promise.  Alternately, LOL

20 should be barred from enforcing the alleged agreements under the doctrine of

21 promissory estoppel.

22                    <u>Fifteenth Affirmative Defense</u>

23        LOL's breach of fiduciary duty claim fails as a result of LOL's consent to and/or

24 ratification of Defendants' alleged acts.

25                    <u>Sixteenth Affirmative Defense</u>

26        In the unlikely event that Defendants' claims are dismissed for failure to join an

27 indispensable party (though Defendant disputes the same), LOL's claims should

28 likewise be dismissed for failure to join an indispensable party.

## Seventeenth Affirmative Defense

LOL's claims are barred because it has been unjustly enriched at Defendants' expense by repudiating its business relationship with WPIL, representing to WPIL's customers that it was no longer affiliated with WPIL or the Ayckbourns, and redirecting WPIL's prior contracts with customers and future business to LOL.

## Eighteenth Affirmative Defense

LOL's breach of contract claims are barred because they are substantively and procedurally unconscionable, as LOL has used its unilateral control over its wholly owned factory to obtain inequitable bargaining power over Defendants, extract additional monetary contributions, and force Defendants to consent oppressive business terms.

## Nineteenth Affirmative Defense

LOL's breach of contract claims fail for lack of consideration to the extent that LOL claims it is entitled to additional compensation for expenses outside the parties' established course of dealing, such as labor costs.

## Twentieth Affirmative Defense

Defendants reserve the right to rely upon other such affirmative defenses as may be supported by the facts, to be determined by full and complete discovery, and to voluntarily withdraw any affirmative defenses.

Dated:  September 26, 2023        WARGO FRENCH SINGER LLP

By:  *s/ Jeff Williams*
DAVID M. PERNINI
JEFFREY N. WILLIAMS
BRANDON R. PARRISH

Attorneys for Defendants/Counterclaimants Gary Ayckbourn and Mark Ayckbourn

## COUNTERCLAIM

Counterclaimants Gary and Mark Ayckbourn ("Counterclaimants" or the "Ayckbourns") hereby assert the following Counterclaim against Counterdefendants Line One Laboratories ("LOL"); American Latex Corporation ("ALC"); and Calvin Spencer Lee a/k/a Budiman Lee ("Lee") (collectively, "Counterdefendants"), stating as follows:

## THE PARTIES

1. Gary Ayckbourn is a natural person domiciled in the United Kingdom and a director and Secretary of Defendant Wingpow International Ltd ("WPIL").

2. Mark Ayckbourn is a natural person domiciled in the United Kingdom and a director of WPIL.

3. LOL was, and is, a California corporation having its principal place of business in Chatsworth, in the County of Los Angeles, California, in the United States.

4. ALC was, and is, a California corporation having its principal place of business in Chatsworth, in the County of Los Angeles, California, in the United States.

## JURISDICTION AND VENUE

5. The Court has supplemental jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367(a).  Alternatively, this Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332(a)(2).

6. LOL has submitted to the personal jurisdiction of this Court.

7. ALC, as a California corporation, is subject to the personal jurisdiction of this Court.  Additionally, because ALC is the alter ego of LOL, ALC has submitted to the personal jurisdiction of this Court via LOL.

8. Lee, as an individual domiciled in California, is subject to the personal jurisdiction of this Court.  Additionally, because Lee is the alter ego of LOL, Lee has submitted to the personal jurisdiction of this Court via LOL.

9. LOL has waived any objection to venue in this Court.  Additionally, because ALC and Lee are alter egos of LOL as set forth above, they have likewise

waived any objection to venue in this Court.  Alternatively, venue is proper in this
district under 28 U.S.C. § 1391(b)(1) because all Counterdefendants are residents of this
state and judicial district, and under 28 U.S.C. § 1391(b)(2) because Counterdefendants'
contractual breaches and other wrongful conduct occurred in this judicial district.

10.    Notwithstanding any of the foregoing, Counterclaimants preserve all
objections to personal jurisdiction and venue raised in their motion to dismiss the
Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1).  *Hillis v. Heineman*,
626 F.3d 1014, 1018 (9th Cir. 2010).

## **FACTUAL BACKGROUND**

11.    As background, Counterclaimants specifically incorporate by reference the
allegations contained in Paragraphs 15 to 84 of WPIL's First Amended Counterclaim,
including WPIL's alter ego allegations against Counterdefendants.  (Doc. 50).

11.    For more than 20 years, the Ayckbourns have worked in the sexual health
and wellness industry as professionals.  Over that time, they developed a reputation for
marketing, designing, and selling first-in-class products to major retailers, primarily in
the European Union.  The Ayckbourns also established themselves as experts in the field
of sexual wellness and developed a reputation for professional, first-class customer
service, based on a collaborative and consultative approach with commercial clients.

12.    Although the sexual health and wellness industry is a global business, the
individuals and businesses who operate in this space are relatively few in number, and
because of the Ayckbourns' and WPIL's success and client-first approach, the
Ayckbourns became well known in the insular sexual wellness industry as trustworthy
and reliable.  Prior to the Ayckbourns' work in the industry, it was viewed as seedy and
unscrupulous.  The Ayckbourns were among the first individuals to professionalize the
global sexual wellness industry and helped transform popular sentiment toward the
industry.  Between approximately 2004 and 2022, the Ayckbourns worked tirelessly to
bring the standards and professionalism of the corporate and business world to the
sexual wellness world and, by doing so, gained a reputation as pioneers in the industry.

Rather than limiting sales to adult-only retailers, many of whom did not adopt corporate business practices, the Ayckbourns marketed Wingpow products to a number of large, commercially mainstream retailers, particularly in Europe where sexual health products were increasingly accepted in everyday culture. They also developed personal relationships with many customers and professionals in the industry through years of business, attending industry trade shows and conferences, and hosting and visiting customers regularly. The Ayckbourns also were responsible for transforming the practice of marketing and branding as applied to sexual wellness products, designing entire families of products that integrated seamlessly with one another, adopting differing themes based on customers' increasingly-unique wellness needs.

13.    In addition to cutting WPIL out of the parties' joint business on or about April 5, 2022, Budiman Lee, in both his individual capacity and acting as principal of LOL and ALC, immediately began to solicit WPIL's customers, malign the Ayckbourns to those customers, and seek to ensure that customers and others in the sexual health industry did not work with the Ayckbourns in the future—even if the Ayckbourns partnered with a different manufacturer. As a result, the Ayckbourns' reputations, which took decades to build, have been destroyed and they have effectively been frozen out of their chosen profession.

14.    From at least April 5, 2022 to the present, Lee has used untruths and outright lies to demolish the Ayckbourns' reputations and position himself as the party who had been responsible for the outstanding work the Ayckbourns had done on behalf of Wingpow for fifteen-plus years, even though Lee had increasingly limited involvement with Wingpow other than owning the factory. The goal was to steal all of the Wingpow business for himself and leave the Ayckbourns unable to recover their customers and partner with another manufacturer, and Lee succeeded. During conversations and email communications with customers, Lee defamed the Ayckbourns, both individually and as the principals of WPIL, to at least nine (9) of WPIL's customers and/or future customers. Lee's falsehoods to customers generally took the form of one

or more of the following defamatory statements: that the Ayckbourns had stolen money from him, that they owed him over $2 million in overdue debt that they refused to pay, that they had lied to customers about the extent of their role in the Wingpow joint business over the course of fifteen-plus years in operation, and that they were untrustworthy and unprofessional.

15.    As an example, one major customer that Lee had repeated phone calls and interactions with from April 2022 onward is WOW Tech Group ("WOW Tech"). Between April 2022 and November 2022, WOW Tech and Lee held conversations by phone, email, and in person at WOW Tech's Berlin office, *conversations which they explicitly agreed to keep secret from the Ayckbourns at Lee's direction*. During those conversations, Lee repeatedly and falsely blamed the Ayckbourns for the failure to exchange defective Wands sold to WOW Tech with replacements and for the events that gave rise to this action. This included false statements that:

a.    WPIL and the Ayckbourns could not "stand behind" the Wands sold to WOW Tech, when in fact it was Lee that had refused to replace the defective Wands manufactured by his own factory and had explicitly told the Ayckbourns that he would take care of the situation;

b.    WPIL, and specifically Gary Ayckbourn, never gave Lee "any instruction" on returning the defective Wands, when in reality Gary Ayckbourn had been asking Lee to arrange for their shipment back to the factory, and Lee had specifically told his staff to refuse to do so in order to evade Chinese customs duties;

c.    The Ayckbourns did "not allow" WOW Tech to contact LOL's Chinese factory directly, when in reality WOW Tech had been in communication with the factory regularly in 2021 and 2022 and WOW Tech representatives had visited the factory with and without the Ayckbourns;

d.    The Ayckbourns were "unprofessional" in how they "represent[ed]" Lee's Chinese factory, when in reality the Ayckbourns regularly informed Lee of

-18-

their efforts to promote Wingpow, sell novel products to existing customers, and attract new customers, and the negative effects of Wingpow's breakup on customers were entirely attributable to Lee;

    e.    The Ayckbourns were "untrustworthy" business partners; and

    f.    WPIL and the Ayckbourns would never pay allegedly outstanding invoices to Lee, when the Ayckbourns in fact had never refused to pay properly owed debts, but merely asserted that Lee was not accurately calculating the sums due between the parties and the parties needed to reach an agreement on what was owed to whom.

16.    Prior to Lee's actions, WOW Tech had done more than $7.5 million in business with WPIL and the Ayckbourns. Afterward, WOW Tech has not done any business with the Ayckbourns, whether through WPIL or otherwise, and in fact has threatened to file suit against WPIL and/or the Ayckbourns for *Lee*'s refusal to replace the defective Wands.

17.    In April and May 2022, Lee discussed terms with another major customer who had worked with WPIL and the Ayckbourns for more than 10 years. As part of those discussions, Lee gratuitously and falsely stated that WPIL owed "above $2.6 million" and "do not intend to pay" him. This statement naturally suggested that the Ayckbourns, as principals of WPIL, were thieves, and was false for the reasons previously stated.

18.    Prior to Lee's actions, this customer had done more than $17 million in business with WPIL and had collaborated extensively with the Ayckbourns to create a product portfolio that included novel and patented goods. Afterward, this customer has not done any business with the Ayckbourns, whether through WPIL or otherwise.

19.    As another example, on May 27, 2022 Lee told a customer who requested the return of its tooling moulds, "I am sorry to inform you that I am not going to release your molds to you due to Wing Pow International LTD. U.K. DID NOT pay my outstanding invoices of around $2.6 million." Lee's ability to return the customer's

-19-

AYCKBOURNS' ANSWER TO SAC AND COUNTERCLAIM

tooling moulds (equipment unique to a customer for which the customer pays at the
outset of the relationship and which is thereafter used to create the customers' molded
plastic goods upon receipt of a purchase order), however, was in no way dependent on
WPIL's payment of any alleged sum and WPIL and the customer had already paid Lee
in full for the moulds.  Moreover, Lee's own records reflect WPIL owed Lee nowhere
near $2.6 million in outstanding debts.  Rather, Lee used these falsehoods to force the
customer to continue purchasing products from LOL's factory instead of taking his
business elsewhere as he had requested (for example, to another manufacturer the
Ayckbourns might later work with), in the process suggesting that the Ayckbourns, as
WPIL's owners and the parties' former points-of-contact with the customer at Wingpow,
were thieves and cheats.

20.     Prior to Lee's actions, this customer had done more than $10 million in
business with WPIL.  Afterward, the customer has not done any business with the
Ayckbourns, whether through WPIL or otherwise.

21.     After Lee cut the Ayckbourns and WPIL out of the Wingpow joint
business, he proceeded to deal with many customers that the Ayckbourns had brought in
and who had planned to increase their business with Wingpow.  One such customer was
Pepper Together ("Pepper"), a startup adult retail business based in Las Vegas that had
retained WPIL to design new products and, subsequently, began to purchase finished
goods from LOL's factory through WPIL.  After representatives at the factory sent two
"Announcement" letters to customers at Lee's direction, Pepper's principal contacted
Lee.  Lee told him that the Ayckbourns had misrepresented that they owned LOL's
factory, when the true facts were that Lee had authorized the Ayckbourns and WPIL to
represent themselves as a single, vertically integrated business called Wingpow.  Lee
also falsely stated, again, that the Ayckbourns owed Lee over $2 million.

22.     This directly impacted the Ayckbourns' relationship with Pepper given that
Pepper's principal stated that said relationship depended on "brutal honesty" and
because he believed the Ayckbourns were dishonest, he would not do business with

them again.  Prior to Lee's actions, the Ayckbourns anticipated doing substantial
marketing, branding, and design work for Pepper, in addition to approximately $366,000
in actual product purchase orders with WPIL.  Afterward, Pepper has not done any
business with the Ayckbourns, whether through WPIL or otherwise, and instead,
transferred its business to LOL.

23.    Following the breakup of the Wingpow joint business, another potential
customer to whom the Ayckbourns had provided design services in 2021 and 2022
contacted Lee to purchase a prototype product for future production.  During a
conversation about that product, Lee told the customer that the Ayckbourns had stolen
the customer's money and could not be trusted.  Lee added that, if the customer worked
with the Ayckbourns in the future (or even anyone associated with the Ayckbourns), he
would refuse to provide any further services or products.  Although the customer re-
approached the Ayckbourns later, the customer stated that he/she could not engage them
in any business capacity because Lee had told him/her that doing so would jeopardize
the customer's business and products with Lee.

24.    Another customer who had worked with the Ayckbourns and WPIL for
many years threatened to file suit against both WPIL and LOL following the breakup of
the parties' relationship.  The Ayckbourns had developed personal relationships with the
owner of this customer for many years, but after the owner talked with Lee personally,
he refused to discuss the matter with the Ayckbourns.  The customer's in-house counsel
later recounted to Mark Ayckbourn that the owner was "very angry" because Lee had
told the owner that the Ayckbourns had lied, stolen the customer's money, and were
personally untrustworthy.  To this day, the customer's owner will have no involvement
with the Ayckbourns based on Lee's false allegations and defamatory comments.

25.    Prior to Lee's actions, this customer had done approximately $7.6 million in
business with WPIL.  Afterward, the customer has not done any business with the
Ayckbourns, whether through WPIL or otherwise.

**AYCKBOURNS' ANSWER TO SAC AND COUNTERCLAIM**

26.    Yet another potential customer based in Europe had worked with the Ayckbourns in 2021 and early 2022 on designing products to be manufactured at LOL's factory, with the expectation that the potential customer would become a major manufacturing client.  After the customer talked with Lee following the end of the parties' business relationship, the customer recounted to the Ayckbourns that, based on their conversations with Lee, they now believed the Ayckbourns had embezzled money from Wingpow and were refusing to pay Lee what was owed, amounting to more than $2 million.  Because the customer now believed that the Ayckbourns were thieves, the Ayckbourns were unable to secure any future business with a growing retailer in the sexual health industry.

27.    This customer was anticipated to do at least $750,000 in business with either WPIL or the Ayckbourns but for Lee's actions.

28.    Lee was aware that his statements were defaming the Ayckbourns because he insisted on several occasions and in written correspondence with major customers that they only discuss matters verbally, because doing so could "expose" him to liability "due to [the] current lawsuit."  The Ayckbourns discovered certain of these written communications with customers, at the earliest, in December 2022, when they were disclosed by LOL in discovery to WPIL in connection with this action.

29.    Because of the situation created by Lee in 2021 and 2022, his decision to cut the Ayckbourns out of the Wingpow joint business, and his defamatory communications with customers and others in the sexual health industry, the Ayckbourns' reputations have been left in tatters.  Lee's agreements with customers to keep conversations "confidential" after he had leveraged them into doing business directly with LOL's factory, which controlled the manufacturing of their products, also prevented the Ayckbourns from repairing their reputations and relationships with these customers.  Currently, no firms or individuals that previously worked with the Ayckbourns will do business with them, either through WPIL or through any other venture, based on Lee's threats and lies.  Further, because the Ayckbourns have spent

AYCKBOURNS' ANSWER TO SAC AND COUNTERCLAIM

1  their entire careers working in a niche industry, Lee's lies have become widely
2  circulated rumors about the Ayckbourns that the Ayckbourns have been unable to
3  combat for years due to this pending litigation.  Indeed, the Ayckbourns have been
4  advised on numerous occasions that they had no chance of securing further business in
5  the industry unless they can "clear their name."

6                          **FIRST CLAIM FOR RELIEF**

7                 (For Defamation – Against All Counterdefendants)

8         30.    Counterclaimants repeat, replead, and reallege the allegations contained in
9  the foregoing paragraphs and incorporate the same herein.

10        31.    By stating to third parties, including customers, that for example, the
11 Ayckbourns stole money, refused to pay him what was owed, and were otherwise
12 untrustworthy, Lee, on behalf of Counterdefendants and in his own personal capacity,
13 published false and misleading statements of fact about the Ayckbourns without any
14 legal privilege to do so.

15        32.    Because Lee's false and misleading statements caused harm to the
16 Ayckbourns both personally and in their trade or business, they constitute defamation
17 *per se.*

18        33.    Ayckbourns have been directly damaged by Lee's false and misleading
19 statements because their customers and business associates stopped doing business with
20 them.  As an example, the Ayckbourns have been denied the opportunity to attend
21 industry trade shows, which they did regularly prior to this action, because of their loss
22 of reputation.  This exclusion from the market has prevented the Ayckbourns from
23 continuing to operate WPIL as a supplier of sexual health products or from using their
24 individual reputations to start new ventures in the same industry.  In addition to their
25 inability to attract new business, the Ayckbourns have spent considerable time, energy,
26 and money attempting to reestablish themselves in the industry, to no avail.  Further, the
27 Ayckbourns' health and wellbeing have personally suffered, as they have been subjected

28

to shame, humiliation, mental anguish, ridicule, and a loss of dignity. They have also experienced, among other physical harms, loss of sleep, anxiety, and emotional distress.

34.    Alternatively, in the event Counterdefendants purport to have acted under a claim of legal privilege, that privilege does not apply because they acted with malice toward the Ayckbourns. Lee published false and misleading statements of fact about WPIL and the Ayckbourns intentionally, so as to harm WPIL in its business and portray WPIL as the guilty party to its customers, when in fact it was Counterdefendants whose conduct caused those customers harm. Lee's statements about the Ayckbourns' purported debts to him, their trustworthiness, and the assertion that they had stolen his and customers' money and had embezzled money from WPIL were gratuitous and made for no other reason than to harm the Ayckbourns personally and professionally. Because of the ill will Lee had engendered against the Ayckbourns from the events of 2021 and 2022—including the unjustified halting of production, breakdown of buyout negotiations, and failure to acknowledge any fault in the collapse of the parties' relationship—these statements were made with malice and specific intent to ensure that the Ayckbourns would not be able to work with the same customers, or indeed with any customer in the sexual health industry. Lee had actual knowledge of the effect of his statements, as he specifically asked customers not to discuss the Ayckbourns in writing after he filed this action because he did not want to expose himself to liability.

**PRAYER FOR RELIEF**

WHEREFORE, the Ayckbourns respectfully request the Court grant the following relief:

1.    Award the Ayckbourns general and special damages, including presumed damages, in an amount to be proven and determined by a jury at trial;

2.    Award the Ayckbourns exemplary and/or punitive damages in an amount sufficient to deter Counterdefendants in the future from engaging in the intentional misconduct and omissions complained of herein;

3.    Exercise its equitable powers to enjoin Counterdefendants from defaming the Ayckbourns to third parties in the future;

4.    Award the Ayckbourns their reasonable costs and attorneys' fees in pursuing this Counterclaim;

5.    Award the Ayckbourns pre-judgment and post-judgment interest as permitted by any applicable law; and/or

6.    Award the Ayckbourns such other and further relief as the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

The Ayckbourns hereby demand a jury trial on all claims in this Counterclaim as permitted by law.

Dated:  September 26, 2023          WARGO FRENCH SINGER LLP

By:    *s/ Jeff Williams*
DAVID M. PERNINI
JEFFREY N. WILLIAMS
BRANDON R. PARRISH

Attorneys for Defendants/Counterclaimants Gary Ayckbourn and Mark Ayckbourn