David M. Pernini (Admitted Pro Hac Vice)
dpernini@wfslaw.com
Jeffrey N. Williams (SBN 274008)
jwilliams@wfslaw.com
Brandon R. Parrish (Admitted Pro Hac Vice)
bparrish@wfslaw.com
**WARGO, FRENCH & SINGER LLP**
515 S. Flower St., 18th Floor
Los Angeles, California 90071
Telephone: 310.853.6300
Facsimile: 310.853.6333

Attorneys for Defendants and Counterclaimants Wingpow International Limited, Gary Ayckbourn, and Mark Ayckbourn

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| Line One Laboratories Inc. (USA), a California corporation<br><br>Plaintiff,<br><br>vs.<br><br>Wingpow International Limited, etc. et al.<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No.: 2:22-cv-02401-RAO<br><br>**COUNTERCLAIMANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO COUNTERDEFENDANTS' MOTION FOR NEW TRIAL (DKT. 306)**<br><br>Date: July 2, 2025<br>Time: 10:00am<br>Courtroom: 590<br><br>Hon. Rozella A. Oliver |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS......................................................................................... i

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

LEGAL STANDARD........................................................................................... 1

ARGUMENT ....................................................................................................... 2

A.  Substantial evidence supported the jury's finding of a legal partnership. .............. 3

    1.  From the outset, the parties intended to form a partnership: "Wingpow."... 4

    2.  The parties represented to each other, and the world, that they were partners in one business: "Wingpow." ........................................................... 6

    3.  Counterclaimants shared in the management and control of Wingpow. ...... 8

    4.  The parties shared profits and losses........................................................... 9

B.  The Court did not abuse its discretion to deny Counterdefendants' motion in *limine* to bifurcate trial into a liability and punitive damages phase.................... 12

C.  The Court did not commit "plain error" in issuing an agreed-upon pattern jury instruction for implied-in-fact contract. ................................................................ 14

D.  The Court did not commit "plain error" in its jury instruction for breach of the implied covenant of good faith and fair dealing. ................................................... 17

E.  Counterdefendants have not met their burden to obtain a new trial on the interference claims to which they have no independent objection. ....................... 18

F.  Counterdefendants are not entitled to a new trial on Line One's affirmative claims, which the jury entirely rejected................................................................. 20

CONCLUSION..................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brocklesby v. United States*,
   767 F.2d 1288 (9th Cir. 1985) .................................................................. 14

*Brown v. Fairbanks*,
   121 Cal. App. 2d 432 (1953) ......................................................................6

*Bryant v. Mattel, Inc.*,
   No. 04-CV9049, 2010 WL 11463864 (C.D. Cal. Oct. 29, 2010) ............................ 19

*C.B. v. City of Sonora*,
   769 F.3d 1005 (9th Cir. 2014) ................................................... 3, 15, 17, 18

*Constans v. Ross*,
   106 Cal. App. 2d 381 (1951) ..................................................... 3, 6, 7, 11

*E.E.O.C. v. Pape Lift, Inc.*,
   115 F.3d 676 (9th Cir. 1997) .....................................................................2

*Gilchrist v. Jim Slemons Imports*,
   803 F.2d 1488 (9th Cir. 1986) ................................................................ 2, 19

*Greene v. Brooks*,
   235 Cal. App. 2d 161 (1965) .....................................................................4

*Hamm v. Am. Home Prods. Corp.*,
   888 F. Supp. 1037 (E.D. Cal. 1995) ......................................................... 12

*Hangarter v. Provident Life & Acc. Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) ............................................................... 13, 14

*Hernandez v. City of Los Angeles*,
   19-CV-441, 2022 WL 16551705 (C.D. Cal. Aug. 1, 2022) ............................... 12

*Hilao v. Est. of Marcos*,
   103 F.3d 767 (9th Cir. 1996) .................................................................. 13

*Holmes v. Lerner*,
   74 Cal. App. 4th 442 (1999) .......................................................... 9, 10, 11

*Landes Const. Co. v. Royal Bank of Canada*,
   833 F.2d 1365 (9th Cir. 1987) ........................................................................2

*Lombino v. Bank of America*,
   797 F. Supp. 2d 1078 (D. Nev. 2011) ......................................................... 15

*In re Lona*,
   393 B.R. 1 (N.D. Cal. Bankr. 2008) .............................................................8

*McKiver v. Murphy-Brown, LLC*,
   980 F.3d 937 (4th Cir. 2020) ...................................................................... 13

*S.E.C. v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) .....................................................................2

*Sarcuni v. bZx DAO*,
   664 F. Supp. 3d 1100 (S.D. Cal. 2023) .......................................................7

*Second Measure, Inc. v. Kim*,
   143 F. Supp. 3d 961 (N.D. Cal. 2015).................................................... 4, 10

*U.S. v. Singh-Sidhu*,
   644 F. App'x 784 (9th Cir. 2016) ................................................................2

*U.S. v. Turman*,
   122 F. 3d 1167 (9th Cir. 1997) .................................................................. 15

*Yates v. GunnAllen Fin.*,
   No. C05-1510 BZ, 2006 WL 1821194 (N.D. Cal. June 30, 2006) ..............2

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001) .....................................................................2

*Zivkovic v. S. California Edison Co.*,
   302 F.3d 1080 (9th Cir. 2002) ................................................................... 12

**Statutes**

Cal. Corp. Code § 16101(13)..............................................................................5

Cal. Corp. Code § 16202(a), (c)(2), (3) ...................................................... 3, 5, 9

**Court Rules**

Fed. R. Civ. P. 42(b) ....................................................................................... 12

**Other Authorities**

CACI 303 ................................................................................................................ 17

CACI 305 ................................................................................................ 14, 16, 17

CACI 3934 .............................................................................................................. 19

# INTRODUCTION[1]

After substituting in nearly two months after a jury trial in which a well-instructed jury unanimously found against Counterdefendants, their new counsel has filed a motion asking to re-try the entire case.  Dkt. 306, 306-1 ("Mtn.").  But their arguments rely on misrepresentations of the trial transcript and cherry-pick evidence to fit a narrative that no person actually *present* at the trial would ever believe.  Indeed, the jury did not believe the narrative, and the verdict reflected that.  Put simply, they would like to re-litigate this case with the benefit of hindsight regarding how the jury would perceive the evidence and the testimony of their only witness, Budiman Lee.  But their arguments are nothing more than post-hoc efforts for a second bite at the apple on previous, consciously-chosen and ultimately unsuccessful trial strategies. To the extent they have not waived or invited error on nearly every issue, Counterdefendants entirely fail to meet the stringent standard to throw out the jury verdict and order a new trial.  Their arguments require rejecting consistent testimony from multiple witnesses, assigning complete credibility to Lee despite his many false statements and proven bad faith, and ignoring troves of documentary evidence.  The Court should deny the Motion in full.

## LEGAL STANDARD

Counterdefendants' arguments in this new trial motion generally fall into two categories: (i) lack of substantial evidence to support the verdict; and (ii) purported errors in the jury instructions and/or verdict form.

With respect to the former, Counterdefendants misstate the standard for a new trial and wrongly imply that the court need even not consider the jury's findings, stating that "[e]ven if a jury verdict is supported by substantial evidence, the Court can order a new trial, if the balance of the evidence tilts the opposite way."  Mtn. at 4.  This is not the standard in the Ninth Circuit.  Rather, a court is required to give "full respect to the jury's

---

[1] As set forth in Counterclaimants' Ex Parte Application to Amend Briefing Schedule for New Trial, Dkt. 319, undersigned counsel acknowledge their error in calendaring the deadline for this response and apologize for any inconvenience caused.

findings" when considering a motion for new trial. *Landes Const. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1371–72 (9th Cir. 1987). While the court has "some discretion" in evaluating a motion for new trial, "a stringent standard applies when the motion is based on insufficiency of the evidence. A motion will be granted on this ground only if the verdict 'is against the 'great weight' of the evidence, or 'it is quite clear that the jury has reached a seriously erroneous result.'" *E.E.O.C. v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997).

Counterdefendants also raise various arguments regarding purportedly erroneous jury instructions or the verdict form—documents to which Counterdefendants largely agreed before trial. Yet under the "invited error" doctrine, a party forfeits any ability to later challenge a jury instruction or verdict form when it jointly submits or stipulates to the given instruction or verdict form. *See, e.g., Gilchrist v. Jim Slemons Imports*, 803 F.2d 1488, 1493 (9th Cir. 1986) ("[Complaining parties] . . . jointly submitted all of the jury instructions given by the court. A party who requests an instruction invites any error contained therein."); *U.S. v. Singh-Sidhu*, 644 F. App'x 784, 785 (9th Cir. 2016) ("[Complaining party] invited the error, if any, when he stipulated to the jury instruction on [one element of plaintiff's claim] and proposed the jury instruction on [another]."); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109-10 (9th Cir. 2001) (party waived objections to verdict form by not raising them prior to jury discharge); *Yates v. GunnAllen Fin.*, No. C05-1510 BZ, 2006 WL 1821194, at *1 (N.D. Cal. June 30, 2006) (defendants waived objections to "instructions submitted by defendants or joint instructions to which defendants had agreed"). In instances where a party has mistakenly—as opposed to knowingly—invited the error it now asserts as a ground for new trial, the record may only be reviewed for "plain error." *C.B. v. City of Sonora*, 769 F.3d 1005, 1018–19 (9th Cir. 2014).

## ARGUMENT

Counterdefendants' new trial motion suffers from the overall defect that it does not even attempt to grapple with the exacting standards set for such motions. Rather than

analyze the evidence as whole, Counterdefendants mischaracterize the testimony, substitute their own interpretations of the evidence for those clearly and properly reached by the jury, and cherry-pick certain evidence while ignoring the vast majority of the record that undercuts their arguments.   Counterdefendants also rarely acknowledge that the nature of their objections at this late stage of the proceedings are nothing but belated, untimely attacks on jury instructions and a verdict form to which they themselves agreed, never objected, or both.   Granting any portion of the motion on any of these grounds would be plainly unjust and an affront to a proper and well-considered jury verdict.

**A.    Substantial evidence supported the jury's finding of a legal partnership.**

Counterdefendants' primary challenge to the verdict is that the trial evidence did not support the jury's finding of a partnership between Wingpow International Ltd. ("Wingpow International") and Line One.   Their request for a new trial, however, relies largely on inapplicable law from other states, glosses over core parts of California law on the issue, and ignores virtually all of the trial record.   Mtn. at 4–13.

In California, a partnership is defined as "association of two or more persons to carry on as coowners a business of profit."   Cal. Corp. Code § 16202(a).   A partnership is evidenced by the sharing of profits and losses and in the management of the business. *Constans v. Ross*, 106 Cal. App. 2d 381, 386–87 (1951).   A partnership need not be evidenced by a writing, and "[i]t is immaterial that the parties do not designate the relationship as a partnership or realize that they are partners, for the intent may be implied from their acts." *Greene v. Brooks*, 235 Cal. App. 2d 161, 166 (1965).   No specific indicia are dispositive of whether a partnership is formed.   "Instead, the existence of a joint venture or partnership depends on the overall set of facts and circumstances about the business relationship." *Second Measure, Inc. v. Kim*, 143 F. Supp. 3d 961, 972 (N.D. Cal. 2015) (citing California law).

Applying this long-established law, reflected in the jury instructions, the amount of evidence that supports the jury's partnership finding is truly staggering.   Although by no

means exhaustive, the material evidence discussed below is more than enough for the Court to conclude that the jury's verdict was sound.

       1.    *From the outset, the parties intended to form a partnership: "Wingpow."*

Wingpow's origin story shows that the parties entered a partnership through the entities they incorporated in their respective countries.  The evidence at trial confirmed that the idea grew out of a separate arrangement between the parties while operating as "Top Cat" and "Richie Winter," which was a pure producer-distributor relationship or manufacturer-wholesaler relationship.  Williams Decl., Ex. A ("Trial Transcript or "Tr.") 486:4–489:2, 493:3–20.  When confronted with counterfeit goods, the parties collectively decided that they needed to start producing products under one name, with an exclusive relationship, from a single factory uniquely for each customer.  Tr. 489:3–491:2, 493:21–494:21.  That was the basic premise of Wingpow: customers would understand that they were "dealing with one business."  *See* Tr. 496:5–16, 510:11–511:2, 778:10–14.

Conversations about starting one business and the initial terms of the oral partnership agreement coincided with the very start of the factory.  Tr. 491:4–23, 493:3–20; Ex. 769.  From 2004 to 2006, the parties' relationship took shape, as Lee built the factory and committed to managing it, with the Ayckbourns managing the rest of the joint business.  Tr. 491:4–493:2.  The parties referred to themselves under common names for various parts of the same business, including the factory as "Wingpow China" and Wingpow International as "Wingpow UK."[2]  Tr. 501:10–18.  That terminology persisted even to the day that Lee ended the relationship.  *See* Ex. 602.

Counterdefendants assert an argument that, because Line One and Wingpow International were separate entities and incorporated at different times, that precludes a partnership finding.  Mtn. at 5.  This argument has no merit and is directly foreclosed by the statute.  The statute contemplates that a partnership can be made by two or more "persons."  Cal. Corp. Code § 16202(a).  As an association of "persons," a partnership can

---

[2] Lee also previously used an entity bearing the "Wingpow" name to conduct the partnership's business, but it was retired at some point.  *See* Tr. 473:8–18.

be made up of entities in the same way as individuals.  *See* Cal. Corp. Code § 16101(13) (defining "person" to include corporations and "any other legal or commercial entity").

Moreover, Counterdefendants' reliance on a single document from ***2013*** (not 2006) presented to potential outside investors, who naturally would not have cared about the parties' oral agreement, does not rebut any portion of the Ayckbourns' consistent and corroborated explanation of Wingpow's origin and basic premise.  *See* Ex. 449 at WINGPOW0001125; Tr. 480:1–22 (explaining that Ex. 449 was created in mid-2013). While the parties had no written agreement, and the entities were not jointly owned, that was attributable purely to Lee.  The unrebutted evidence showed that he refused to sign any contract on his own or Line One's behalf—including a partnership agreement.  *See* Tr. 353:11–13, 496:17–497:7, 802:1–16.  Moreover, Lee shifted the companies he would use to conduct partnership business at will, *see* Tr. 505:2–506:23; Ex. 830 (showing payments to Line One, American Latex, and Lee personally), but Wingpow International was formed in 2006 and used continuously to conduct partnership business under one "Wingpow" name.  Tr. 496:3–13.  The trial evidence more than supported the finding that Wingpow was still a partnership.

Further, Counterdefendants' repetitive arguments about whether or not the factory was an asset of Line One or the partnership are red herrings.  Mtn. at 8.  The Ayckbourns never claimed that the physical factory—the real property, foreign entity, and labor force—was a partnership asset, nor was that even an implication of their assertion of a partnership.  *See* Tr. 870:19–871:14.  Partners are allowed to hold their own assets; there is no legal requirement that the entirety of a partner's property must be put into the partnership.  Rather, the partnership's assets were the manufacturing produced by the factory—the components, prototypes, molds, and finished products—along with designs, branding, other intellectual property and goodwill.  *Id.*  The concept is straightforward: if two persons agree to sell products together out of one person's home, they can form a partnership without the home being at risk of becoming partnership property.  *See Brown v. Fairbanks*, 121 Cal. App. 2d 432, 441 (1953) ("To constitute a partnership it is not

necessary that there should be property forming its capital jointly owned by the partners."). The business the partners run is the partnership. Here, the jury was more than capable of finding a partnership between Line One and Wingpow International without automatically deeming Wingpow China a partnership asset.

### 2. The parties operated and referred to themselves as partners in one business: "Wingpow."

From the very beginning and confirmed by an array of corroborating evidence covering their nearly 20-year relationship, the parties referred to themselves as "business partners," both in person and to third parties, and represented themselves as principals in one business. *See* Exs. 751, 752, 754, 765; Tr. 926:2–12. These references had meaning, reflected the parties' intent, and contrary to Counterdefendants' insistence otherwise, are material evidence. *See Constans*, 106 Cal. App. 3d at 376 ("[S]ome weight must be given to the language of the parties themselves.").

Indeed, the parties marketed themselves commercially as key executives in the same business, with all aspects (including in-house manufacturing and design) represented as part of Wingpow. Ex. 753 at LOL_RPI_0042461–69; Ex. 759 (containing a published editorial that was sent to Budiman Lee); Ex. 778; *see also* Tr. 832:15–19 (Mark Ayckbourn describing his effective role as "COO"). Lee noted in an email to Gary Ayckbourn **as late as May 2021** that he had relayed to a third party, "yes, Gary and I still running Wingpow." Ex. 781. Lee even requested that Gary **remove** his name from third party contracts based on the understanding that "everyone know[s] that you are my partners." Ex. 755. But directly contrary to Counterdefendants' arguments, Mtn. at 5–6, the contracts with customers frequently listed *both* Wingpow International *and* the factory and defined them collectively as "WINGPOW" or "Supplier." *See, e.g.*, Exs. 741, 718.

There was no evidence that Lee ever referred to the Ayckbourns during their relationship, either privately or in public, as "sales agents," "sales representatives," "distributors," "wholesalers," or similar. *See* Tr. 374:6–20, 925:17–926:1. Lee admitted as much. *Id.* His only attempt to explain why the Ayckbourns should still be considered

his agents despite that he had never referred to them as much was his unilateral belief that Gary "should understand" that his role was only as a sales agent—even if they never actually discussed it and it was not reflected in any writing.[3]  Tr. 374:6–16.  The jury was more than within its rights to disregard this testimony as self-serving and lacking credibility.  Indeed, according to the testimony of Derek Block, a third party with extensive knowledge of the industry, the relationship that Wingpow International had with Lee, his companies, and the factory bore none of the hallmarks of a sales agent relationship.  Tr. Vol 4 at 930:2–933:3.

Counterdefendants rely on a single document, Trial Exhibit 452, as an "admission" by Gary Ayckbourn that Line One and Wingpow International had no "shared ownership."  But the email itself and the corresponding testimony establish clearly that Gary Ayckbourn was not speaking in his own words, he was recounting an "angry statement" *from Lee* in December 2021, in the midst of the parties' angry dispute.  *See* Tr. 475:5–25; Ex. 452.  The most reasonable construction of this evidence—confirmed by the entire record and the one clearly accepted by the jury—is that Gary Ayckbourn did not subscribe to the statement, he was simply attempting to show Lee that his attempt to recharacterize the entire relationship of the parties for the preceding fifteen years was illogical and not based in fact.  Lee, conversely, was advancing this characterization in bad faith, something the jury certainly was entitled to believe based on the entirety of the trial record.[4]  Thus, Exhibit 452 cannot be used to overturn the jury's clear finding that the parties operated and referred to themselves as partners.

---

[3] Lee's testimony is, at most, evidence of a "subjective or undisclosed intention" that he was not in a partnership or a failure to realize that his actions created a partnership relationship, which is  immaterial" under California law.  *Constans v. Ross*, 106 Cal. App. 2d 381, 386–87 (1951); *see also Sarcuni v. bZx DAO*, 664 F. Supp. 3d 1100, 1115 (S.D. Cal. 2023) ("[P]ersons may unintentionally create a partnership where their actions and behavior demonstrate an intent to engage in business together." (citation omitted)).

[4] When the business was profitable and functioning, Lee was a partner, but when he unilaterally felt it was not advantageous for him, he decided that he was not.  Other documents from that same time period showed that Lee previewed a plan to repudiate the

### 3. Counterclaimants shared in the management and control of Wingpow.

In addition to the sharing of profits and losses, a partnership is further evidenced by the "contribution by the partners of either money, property or services and some degree of participation by the partners in the management and control of the business." *In re Lona*, 393 B.R. 1, 14 (N.D. Cal. Bankr. 2008) (applying California law). The Ayckbourns, through Wingpow International, contributed all of their time and labor toward this business, managed virtually all of the partnership's practical operations, and shared primary decision-making authority with Lee. The record on this point is overwhelming.

Gary and Mark Ayckbourn directed the entire product development process, including managing the engineering and design teams. Tr. 524:7–16; Ex. 672 (showing Mark Ayckbourn's emails instructing factory employees). Mark Ayckbourn personally designed nearly every product and invention that came out of Wingpow—a point that Lee was proven through third-party testimony and contemporaneous documents to have lied about. *See* Tr. 779:23–780:21, 781:13–783:9, 785:4–7, 790:9–792:6; Exs. 672, 674, 681, 900; *see also* Tr. Vol. 4 at 928:22–930:19. The Ayckbourns had offices on the top floor of the factory with Lee, visited China multiple times per year (with and without Lee), spoke at anniversaries as principals of the business, and knew the staff personally. Tr. 518:15–524:6, 801:19–25; Exs. 769, 770, 771.

Lee's own words over the years confirm the Ayckbourns' management roles. In 2013, Lee described the parties' roles as follows: "Gary and Mark are still handling the day to day operation, and I just step in when trouble need to be solved in Factory and China Government Dept." Ex. 757 at WINGPOW0032917. In 2021, he and Gary were "still running Wingpow." Ex. 781 at WINGPOW0028262.

These were not just words; they were reflected in practice. Gary Ayckbourn had unilateral authority to negotiate pricing with customers. Tr. 517:5–518:21. Mark

Ayckbourns, pressure them into a buyout of his interest in the business, disclaim the partnership when it failed, and subsequently appropriate all of the partnership's business for himself. *See* Ex. 653 ("Do you think what kind of consequences you will encounter if I email to every customers you are NOT my partners."); Ex. 774.

8

Ayckbourn managed the operations between the customers and the factory to complete product development cycles and meet manufacturing timelines.  Tr. 849:2–13, 853:8–855:1, 855:19–21.  The parties agreed to patent Mark Ayckbourn's designs and inventions for the partnership's benefit, enforced them together against third parties, and used a law firm that (the Ayckbourns understood) represented them jointly.  Tr. 524:23–525:11, 525:24–528:4, 543:22–546:17, 797:20–25, 798:14–799:2; Exs. 691, 757.  Finally, when the parties needed to mitigate costs at the factory, decisions on temporarily closing the factory or shortening working hours were a *collective* decision, reflected in the parties' written communications.  *See* Tr. at 280:19–281:2; Ex. 448.

Other than quibbling over whether Gary Ayckbourn had a key to the factory or who had the bigger office, Lee offered zero evidence to rebut any of these facts.

### 4.    The parties shared profits and losses.

Under California law, a partnership is an association to carry on a "business for profit."  Cal. Corp. Code § 16202(a).  California courts have interpreted this language to mean that "profit sharing" is "evidence of a partnership, rather than a required element."  *Holmes v. Lerner*, 74 Cal. App. 4th 442, 454–55 (1999).  Under the current statute, "a person who receives a share of the profits in a business is presumed to be a partner," and the sharing of "gross returns . . . does not by itself establish a partnership." Cal. Corp. Code § 16202(c)(2), (3).  However, sharing of profits, whether net or gross, is material evidence.  *Second Measure, Inc. v. Kim*, 143 F. Supp. 3d 961, 978 (N.D. Cal. 2015).  Counterdefendants spend much of their argument focusing on the distinction between net and gross profits and asking the Court to apply New York, Rhode Island, or some other state's laws.  *See* Mtn. at 10–12.  Counterdefendants provide no authority, however, suggesting that any of these states' laws have any relevance or that California courts look to any of their these states' laws to interpret its partnership statutes.

From the beginning, the parties incorporated a 60-40 profit split that went into virtually every financial aspect of their business.[5]  Tr. 492:3–20.  The invoicing system between the parties incorporated that 60-40 arrangement, where costs from the factory were built into its invoices that were sent to both parties.  Tr. 458:16–22, 492:9–14.  Because the factory's costs were incorporated into their invoices, there was no evidence that either of the parties ever actually lost money until the COVID-19 pandemic; effectively, there were no net losses to share for the majority of the partnership.  *See* Tr. 452:3–15.  The parties also periodically reconciled their debts between one another consistent with a single business, including profits from customers that paid the factory or Lee directly.  Tr. 503:24–505:1.  In sum, even if the Court were construing the evidence in Counterdefendants' favor—which is ***not*** the standard on this new trial motion—at most it would show the sharing of gross returns, which remains valid evidence of a partnership under California law.  *See Holmes*, 74 Cal. App. 4th at 454–55.

Even beyond their clear profit-sharing, Wingpow International bore an ever-growing financial burden of the partnership's costs.  In 2018, the parties agreed that Wingpow International would bear a portion of the finances up-front through a credit facility.  Tr. 565:21–568:4.  Over the years, Lee also asked that it bear the burden on numerous other costs related to the factory, including Chinese taxes (Tr. 386:16–24); currency exchange rates (Tr. 548:10–551:13; Ex. 765); certifications and audits (Tr. 551:14–553:5; Ex. 776); and factory molds and equipment (Tr. 553:6–554:24, 576:8–20; Exs. 608.1, 874).

---

[5] Counterdefendants refer to a document that labeled the profit share as a "commission" and hold this document up as if it were talismanic because it was produced by Wingpow International.  But the testimony is clear that Wingpow International only used the word "[b]ecause Mr. Lee [said] that for his bank record he needed to call them that, but [the parties had] always called them profit share."  Tr. 614:5–11.  All other references to "commissions" are based on a handful of documents that were largely written by Budiman Lee in his bank transfer records for *one customer* and reflected in corresponding invoices.  *See* Ex. 745 (showing email from Lee with attachment "OhMiBod profit split"); Ex. 762 (showing Lee referring to the parties' arrangement as "profit sharing" and suggesting that the parties change their relationship to an "independent contractor");

The best evidence, however, comes from Counterdefendants' failed claim for "labor shortages." Once the factory purportedly started losing money during the COVID pandemic, according to Lee, he immediately asked Wingpow International to "shoulder" those losses with him in 2021. Tr. 284:23–285:21; Ex. 498. What the parties called "labor shortages" or "labor losses" did not refer merely to extra salary expenses; Lee was asking Wingpow International to bear *40% of the factory's total shortfall* from its inability to maintain full production, which came from component shortages and cost increases and amounted hundreds of thousands of dollars (again, according to Lee). Tr. 278:22–279:14, 803:1–804:25; Ex. 302 at LOL_0011424, 26; *see also* Tr. 169:5–11 (explaining that the term "labor shortages" was a misnomer). Lee wanted Wingpow International to pay this shortfall *indefinitely*—a statement he attempted to distance himself from at trial and was impeached. Tr. 361:14–362:17.

The fact that the parties had *some* separate expenses and separate books based on the international nature of their business does not defeat a partnership finding. *See* Tr. 173:15–20 (stating that the parties' invoicing system was "to keep the money out of China"); *Constans*, 106 Cal. App. 2d at 389 ("The fact that the profits and losses were not equally shared does not necessarily compel a conclusion that no partnership existed. . . . [T]he division may be left to the agreement of the parties."); *cf. Holmes*, 74 Cal. App. 4th at 445–52 (affirming jury award where two women came up with idea for cosmetics company at a "kitchen table" conversation even without agreement to share profits, ownership percentages, or other basic formalities). The full record shows that, in every practical respect, these parties had integrated finances and shared in the profits and losses from the business according to the terms of their ongoing relationship.

The evidence supporting the jury's partnership finding is so overwhelming that any contrary finding would amount to a miscarriage of justice. The Court should reject Counterdefendants' efforts and allow the jury's verdict to stand.

**B.      The Court did not abuse its discretion to deny Counterdefendants' motion in** ***limine*** **to bifurcate trial into a liability and punitive damages phase.**

Counterdefendants also take issue with the introduction at trial of two exhibits and roughly three pages of so-called "wealth evidence," arguing the trial should have been bifurcated for this evidence to be presented in a second phase on punitive damages.  Dkt. 306-1 at 13-16.  Of course, this issue was fully and fairly litigated in *early 2024* via a motion in *limine* that received full briefing from both parties,  and demonstrated the Court had full and proper discretion to allow the testimony and evidence.  Dkt. 148, 161, 184. Counterdefendants had every opportunity to seek to revisit Judge Kato's motion in *limine* ruling in the more than ten months that followed before this case was tried and did not. In any case, Counterdefendants' arguments on this point remain meritless and fail to establish any abuse of discretion whatsoever.

Initially, by arguing that "California requires bifurcation of liability and punitive damages" but failing to mention that California law does not apply, Counterdefendants plainly aim to mislead.  Mtn. at 14-15.  California's state-law procedural requirement that liability and punitive damages phases be bifurcated *does not apply* in federal court.  *See Hamm v. Am. Home Prods. Corp*., 888 F. Supp. 1037, 1038 (E.D. Cal. 1995) (holding that "bifurcation is a procedural issue for purposes of Erie analysis" and applying Rule 42(b) rather than the California Civil Code).  Rather, Rule 42(b) provides federal courts "broad discretion" on the issue of bifurcation, *Zivkovic v. S. California Edison Co.,* 302 F.3d 1080, 1088 (9th Cir. 2002), and the *default* rule in the Ninth Circuit is that all issues should be tried together, such that the jury should hear the parties' evidence in a single proceeding. *Hernandez v. City of Los Angeles*, 19-CV-441, 2022 WL 16551705, at *3 (C.D. Cal. Aug. 1, 2022) ("In the Ninth Circuit, bifurcation is the exception rather than the rule of normal trial procedure."), *citing Hangarter v. Provident Life & Acc. Ins. Co*., 373 F.3d 998, 1021 (9th Cir. 2004) ("[S]ince the evidence usually overlaps substantially, the normal procedure is to try compensatory and punitive damage claims together with appropriate instructions to make clear to the jury the difference in the clear and convincing

evidence required for the award of punitive damages.").[6]  The Court's decision to deny bifurcation may only be overturned if the Court committed an abuse of discretion.  *Hilao v. Est. of Marcos*, 103 F.3d 767, 782 (9th Cir. 1996).

Here, it was well within the Court's discretion under *Hangarter* to admit the evidence at issue rather than hold an entirely separate trial for the introduction of three pages of testimony and two exhibits.  The evidence was plainly relevant to multiple issues that would have been decided in the first phase of a bifurcated trial, including, *inter alia*: (i) whether Lee utilized his superior wealth to leverage Counterclaimants in the course of the partnership; *e.g.*, to force them to pay sums not yet due or to pay more than their fair share of partnership costs; (ii) whether Lee utilized his superior wealth to leverage Counterclaimants in the buyout negotiations over the Wingpow business; (iii) whether Counterclaimants (as Defendants) could prove their affirmative defense of economic duress; and (iv) whether Lee's threats to close the Wingpow China factory were malicious, given that he could afford a shut-down much more easily than Counterclaimants.[7]

Further, as the Ninth Circuit suggested in *Hangarter*, the jury received *agreed-upon* jury instructions "to make clear . . . the difference in the clear and convincing evidence required for the award of punitive damages."  *Hangarter*, 373 F.3d at 1021; *see also* Dkt. 202 at 88-90, 94 (proposed agreed instructions on punitive damages and clear and

---

[6] Counterdefendants also misinform the Court that the Fourth Circuit "*require[s]*" bifurcation.  Mtn. at 15 (emphasis in original).  To the contrary, the case they cite held the exact opposite by rejecting the movant's claim that a state mandatory bifurcation statute should apply, and by citing directly to *Hangarter* for the proposition that the "normal procedure" in federal court is *not* to bifurcate.  *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 974–75 (4th Cir. 2020) (emphasis added).  In other words, *McKiver* supports Counterclaimants' position, not Counterdefendants'.

[7] When Counterdefendants objected at trial, Counterclaimants responded that the evidence was relevant to punitive damages because the Court previously had denied the motion in *limine* on bifurcation.  Tr. 751:4–752:25.  Counterclaimants were not stating that the evidence was *only* admissible to prove punitive damages, particularly because Counterclaimants previously explained the overlap in prior briefing.

convincing evidence); Dkt. 233 at 60-61 (final instruction that punitive damages could only be awarded by clear and convincing evidence of malice, oppression or fraud); Dkt. 233 at 70 (final instruction defining clear and convincing evidence burden of proof).

Counterclaimants do not attempt to argue that the wealth evidence in question was isolated to punitive damages, that it would not have been admissible in the first phase of a bifurcated trial on the issues above, or that they objected to the jury instructions.[8] In fact, they entirely ignore the analysis *Hangarter* mandates and which the Court correctly followed in this case. Instead, they simply identify the fact that wealth evidence was admitted and argue that it should not have been. This is far from enough to meet their heavy burden to establish an abuse of discretion requiring a new trial on all claims.

## C. The Court did not commit "plain error" in issuing an agreed-upon pattern jury instruction for implied-in-fact contract.

Counterdefendants' new counsel continues to raise new arguments never before presented by contending that the *agreed-upon*, *pattern* jury instruction for implied-in-fact contract "erroneously omitted a key element." Mtn. at 17-18. Indeed, the parties stipulated to giving the jury instruction in question because it followed the exact language of the pattern instruction utilized across California courts on this issue: CACI 305. *Compare* Dkt. 202 at 52 (agreed proposed instruction following CACI 305) *with* Dkt. 233 at 13 (final instruction). As such, this entirely new legal argument was knowingly waived and is "not properly before the Court." *See Lombino v. Bank of America*, 797 F. Supp. 2d 1078, 1081–83 (D. Nev. 2011) (deeming several "post-trial legal arguments" raised for the first time in a motion for new trial waived).

---

[8] Of course, if Counterdefendants are now arguing for the first time that some sort of "limiting instruction" was needed *in addition to* the agreed jury instructions on punitive damages and clear and convincing evidence, they made no such request at trial. Tr. 751:4–756:8. As a result, they cannot now claim the Court erred by failing to give one. *See Brocklesby v. United States*, 767 F.2d 1288, 1293 (9th Cir. 1985) ("If a limiting instruction is not requested, any error from failure to give the instruction is waived.").

Even if not fully waived, because Counterdefendants concede that because they stipulated to this instruction and did not otherwise object, the high burden of "plain error" applies to their argument. When reviewing jury instructions for plain error, a court must consider whether: (1) there was an error; (2) the error was obvious; and (3) the error affected substantial rights. *Sonora*, 769 F.3d at 1018–19. In the civil context, review is purely discretionary, should "encompass only those errors that reach the pinnacle of fault envisioned by the standard set forth above," and should only be utilized to overturn a verdict if needed to prevent a miscarriage of justice, meaning that "the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *Id.* Courts also should consider the "costs of correcting an error," *id.*, and whether the error was so "clear-cut" that a judge should be able to avoid the error "without benefit of objection." *U.S. v. Turman*, 122 F. 3d 1167, 1170 (9th Cir. 1997).

Counterdefendants do not even attempt to meet this burden. They simply cite the standard and a Second Circuit case concerning the "basic elements of promissory estoppel," which has no bearing here whatsoever. And indeed, not only do Counterdefendants fail to meet their burden to show that the alleged error constituted a miscarriage of justice, they do not even establish an error at all.

First, while the Motion does not actually attempt to analyze the contract theories of the case, Counterdefendants' core proposition that Line One could have avoided a breach by terminating the contract "upon reasonable notice" is simply wrong. Mtn. at 17. The verdict form—to which Counterdefendants also agreed—identified the breach as "refusing to fulfill purchase orders obtained by Wingpow International and/or by refusing to account to Wingpow International for debts and other monies owed pursuant to the parties' established course of dealing." Dkt. 251 at 7. But the evidence showed that Line One stopped fulfilling purchase orders in the fall of 2021, well *before* it purported to terminate the partnership in April 2022. Tr. 568:5–569:19; Exs. 601, 607. Further, while there was no dispute at trial that Line One could have ended the partnership in April 2022 by properly winding it down and accounting to Wingpow International, there also was no

dispute that Line One *did not in fact* wind down and account to Wingpow International. Tr. 598:14–601:14, 728:25–731:25.  Indeed, this concept was addressed in the jury instruction on partnerships, which properly instructed the jury as follows: "If the partnership is dissolved, the business must be wound up. Winding up is the process of completing all of the partnership's uncompleted transactions, of reducing all assets to cash, and of distributing the proceeds, if any, to the partners."  Dkt. 233 at 6.  As a result, it was plainly irrelevant to the verdict whether Line One could have terminated a contract "upon reasonable notice" because even if it did, that would not have avoided the breach the jury found.  It is not error to give irrelevant jury instructions.

Second, and related to the foregoing, the idea that the error in question was so "clear-cut" that it should have been obvious to the Court borders on the absurd.  If the omission of this supposedly essential language regarding termination at will of an implied-in-fact contract was so obvious, the language would be included in the pattern instruction. It was not.  Further, Counterclaimants point to zero authority for the proposition that CACI 305 is somehow incomplete or improper because it fails to state that an implied contract is "terminable at will, after a reasonable time, and with reasonable notice."  Mtn. at 17. Nor do Counterclaimants cite any case in which a jury finding for breach of contract was overturned because the jury was not instructed on these specific grounds.[9]  Arguing that a pattern jury instruction incorrectly omits a certain (irrelevant) statement of law without a shred of authority is certainly bold, but it does not establish obviousness.

Third and finally, even assuming *arguendo* that an error occurred and that it was obvious, Counterdefendants simply have made no showing that the error affected substantial rights, that the costs of a new trial justify addressing the issue, or that it would be a miscarriage of justice not to order a new trial.  Indeed, the jury explicitly found that there was a "valid contract" that had been breached.  Dkt. 251 at 7.  It was not limited to

---

[9] Counterdefendants cite one case in which such an instruction was given and, on appeal, the court held that the instruction "accurately state[d] the law."  But that does not mean such an instruction was *necessary* even in that case, much less in this case.

finding that there was an implied contract, and there was substantial evidence at trial of an express oral contract in any event.  Tr. 492:3–20; *see also* Dkt. 233 at 12 (jury instruction for express written and oral contracts).  Thus, a new trial on this ground would be plainly unwarranted for multiple reasons.

**D.    The Court did not commit "plain error" in its jury instruction for breach of the implied covenant of good faith and fair dealing.**

Similar to the above, Counterdefendants also raise the entirely new argument that "the jury was not instructed that, where a breach of contract and a breach of the implied covenant are presented together, the latter claim requires a separate factual basis."  Dkt. 306-1 at 18-19.  As before, the jury instructions for breach of contract and of the implied covenant of good faith and fair dealing were taken directly from the pattern instructions, CACI 303 and 305.  Counterdefendants agreed to the breach of contract jury instruction (Dkt. 202 at 50), and though they originally objected to the implied covenant jury instruction on the ground that some of the language was "argumentative" (Dkt. 203 at 32-34), they later agreed to a revised version proposed by the Court (Dkt. 233 at 19-20; *see also* Dkt. 224).  Counterdefendants also agreed to the portion of the verdict form that they now complain listed "the same factual basis" for the breach of contract and breach of implied covenant claims.  Dkt. 216, 216-1 at 6; *see also* Dkt. 251 at 8.

In short, Counterdefendants never raised the current objection and even if not fully waived, it is therefore subject to a plain error analysis, including that the purported error was "obvious," "affected substantial rights" and "seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  *Sonora*, 769 F.3d at 1018-19.  Counterdefendants make no attempt to meet this burden, nor can they.

The jury found that Line One had refused to fulfill purchase orders and refused to account to Wingpow International for debts owed in the parties' course of dealings, and then found such actions could amount to a breach of contract or a breach of the implied covenant.  Dkt. 251 at 7.  This did not affect "substantial rights" because the agreed verdict form did not itemize separate damages for each claim and the agreed jury instructions

clearly instructed the jury that damages could be awarded only once for the failure to pay debts and profit-share to which Counterclaimants were entitled.  *See* Dkt. 233 at 57. Indeed, the jury is presumed to have followed jury instructions that stated exactly what Counterdefendants argue here; *i.e.*, that damages could not be separately awarded for both breach of contract and breach of the implied covenant.  And the jury properly awarded a single damages figure for the failure to pay debts and profit-share owed to Counterclaimants, regardless of the theory.  There is therefore no situation in which including both claims in the verdict form could have affected Counterdefendants' rights at all, much less "seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  *Sonora*, 769 F.3d at 1018-19.  Accordingly, there was no plain error associated with this jury instruction.

**E.     Counterdefendants have not met their burden to obtain a new trial on the interference claims to which they have no independent objection.**

A person reading the Opposition up until page 19 might be forgiven for wondering why Counterdefendants had expended so much effort in attacking the jury verdict on claims that they themselves have argued have no ultimate effect on the Judgment.  *See, e.g.,* Dkt. 293-1 (arguing that the only relevant portions of the Judgment are the awards against Lee for tortious interference and defamation).  Their efforts make more sense when one finally reaches their astounding argument that because the verdict form grouped certain counterclaims together under different theories of harm, any minor defect in any one counterclaim requires a new trial on *all* counterclaims.  Dkt. 306-1 at 19-20.  Of course, for the reasons set forth above, Counterdefendants have not met their burden to obtain a new trial on *any* of the counterclaims, so the Court need not even reach their "Hail-Mary" theory for throwing out the entire verdict.

But the theory itself is plainly infirm.  Counterdefendants appear to rely on cases suggesting that in certain circumstances where two claims are "factually inseparable," a new trial cannot be awarded on one of the two claims without also awarding a new trial on the other.  *Bryant v. Mattel, Inc*., No. 04-CV9049, 2010 WL 11463864, at *9 (C.D.

Cal. Oct. 29, 2010).  But Counterdefendants have made no effort to actually demonstrate to the Court that any of the counterclaims are "factually inseparable."  They cite no testimony or evidence at all.  Counterdefendants merely point to the verdict form and suggest that because certain counterclaims were grouped together under the same theory of harm, they must be "interwoven."  Dkt. 306-1 at 19-20.  But their attack on the verdict form continues to fail because they themselves agreed to it, and they therefore invited whatever error they are currently complaining about.  *Gilchrist*, 803 F.2d at 1493.

Counterdefendants also ignore that the jury instructions clearly explained that the verdict form would group claims together under a certain type of harm expressly to avoid double-recovery.  *See* Dkt. 233 at 56-58 (following CACI 3934).  In other words, this grouping of claims was undertaken to *benefit Counterdefendants*, who surely would have objected if—for example—the verdict form allowed the jury to award damages for the destruction of Wingpow International's business under a theory of fiduciary duty and then again under a theory of tortious interference.[10]  But just because those counterclaims were grouped together under the same heading in the verdict form does not make them "factually inseparable."  Indeed, the fiduciary duty claims were premised on Lee's obligations as a partner through Line One.  The contract claims were based on the parties' explicit and implied agreement on the production and payment of goods.  And the interference claims were premised on Wingpow International's contracts and relationships with third parties.  There is no logical reason the jury could not have awarded the same sum of money as damages based on just one of these legal theories.  Indeed, that is what the jury was expressly instructed to do.

---

[10] This also dooms Counterdefendants' separate argument that retrial is required on damages for the tortious interference claims, which is supported by no independent analysis or authority.  Mtn. at 20.  None of the claims were "tainted by claims on which retrial is required" because the jury was specifically instructed—in accordance with the pattern jury instruction on this topic—that damages should only be awarded once for each theory of harm to avoid double-recovery.  Counterdefendants agreed to the same in the verdict form and jury instructions.

Accordingly, there simply is no basis on which to throw out the entire jury verdict *even as to counterclaims on which Counterdefendants have no particular objection*.

**F.      Counterdefendants are not entitled to a new trial on Line One's affirmative claims, which the jury entirely rejected.**

Counterdefendants finally, and boldly, ask this Court to order a new trial on *Line One's* claims for breach of contract which the jury thoroughly rejected. To support this argument, Counterdefendants cite solely to Lee's testimony identifying certain invoices and the Gary Ayckbourn's regarding Wingpow International's internal records. Far from being "abundant evidence" that so clearly demonstrates a breach that it would be a manifest injustice to respect the verdict, these record citations do not even create a *prima facie* claim for breach of contract. Further, Counterdefendants entirely ignore the contrary evidence provided at trial as well as the numerous affirmative defenses asserted in response to these claims, all of which easily could support jury verdict. They therefore cannot carry their significant burden on this motion.

As but one example, the jury instructions properly stated that to recover on its claim for breach of contract, Line One had to prove "[t]hat the party asserting breach of the contract (Line One) did all, or substantially all, of the significant things that the contract required it to do." Dkt. 233 at 11. Counterdefendants do not even attempt to show that any evidence supported this element. This is not a mere oversight, as the record is replete with evidence that Line One breached the contract first. For example, Line breached its agreements with Counterclaimants as early as November 2021, when it stopped filling existing orders from Wingpow. *See* Tr. 568:15–572:6; 578:8–579:7; 600:3–605:12; 607:7–19; Ex. 601. And because Line One did not establish this element, the jury was entirely authorized to reject the breach of contract claim. Similarly, the jury was properly instructed that to recover any damages Line One had to "prove the amount due under the contract." Dkt. 233 at 24. Counterdefendants ignore this requirement as well, as there was significant testimony disputing Line One's claims to be owed money—including Lee's admissions on the stand that a significant amount of the sums he claimed to be owed

were not actually payable and that even though he stopped fulfilling purchase orders, Wingpow International continued paying him all the way up through the date he terminated the partnership.  Tr. 305:6–23, 340:3-343:5, 348:24-351:2, 444:11–446:20, 665:22–666:14.  Certainly, the jury could have found this evidence credible and found that Line One had not proved the required elements of its claim that Wingpow International breached a contract to pay for goods.  Far from showing some manifest injustice, there is substantial evidence to justify the jury's verdict on this ground alone.

In addition, Counterdefendants entirely ignore the evidence supporting numerous affirmative defenses.  Counterdefendants do not deny that the jury was properly charged on the affirmative defenses such as Unclean Hands, Economic Duress, Fraud, and Failure to Mitigate.  Dkt. 233 at 21–22, 63–64.  It is Counterdefendants' burden to demonstrate that the "great weight" of the evidence dispelled each and every one of these affirmative defenses, and they make no attempt to do so.  Nor can they, as there was more than substantial evidence at trial for the jury to accept these defenses and reject Line One's claims.  *See, e.g.*, Tr. 463:21–464:11; 607:7–613:8 (testimony regarding payments due to Wingpow from Line One); 568:5–571:4; 577:20–579:7; 850:16–851:17 (testimony that Lee threatened to close the business if Counterclaimants did not agree to Lee's terms).  There was no miscarriage of justice in the jury's verdict.  Rather, the jury performed its duty as properly directed by this Court, and the Court should reject Counterdefendants' attempt to overturn it.

//

//

//

//

//

## **CONCLUSION**

For the foregoing reasons, the Court should deny the motion in its entirety.


Date: June 4, 2025                      WARGO, FRENCH & SINGER LLP


                                        By: */s Jeff Williams*_____
                                            David M. Pernini
                                            Jeffrey N. Williams
                                            Brandon R. Parrish

                                        Attorneys for Defendants and Counterclaimants

The undersigned, counsel of record for Defendants and Counterclaimants, certifies that this brief contains 6,997 words, which complies with the word limit of L.R. 11-6.1.


Date: June 4, 2025                      WARGO, FRENCH & SINGER LLP


                                        By: */s Jeff Williams*_____
                                            Jeffrey N. Williams

                                        Attorneys for Defendants and Counterclaimants